**No. 25-10461**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

SPIRIT AIRLINES, INC.,

*Petitioner*,

v.

TRANSPORTATION SECURITY ADMINISTRATION,

*Respondent.*

On Petition for Review of the Transportation Security
Administration's Final Decision Dated December 16, 2024

## BRIEF OF PETITIONER SPIRIT AIRLINES, LLC

Adam P. Feinberg
 *Counsel of Record*
 MILLER & CHEVALIER CHARTERED
 900 Sixteenth St. NW
 Washington, DC 20006
 (202) 626-5800
 afeinberg@milchev.com

July 10, 2025                *Counsel for Petitioner*

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Petitioner Spirit Airlines, LLC[1] certifies that it is wholly-owned by Spirit Aviation Holdings, Inc. (ticker: FLYY) and that no other publicly held corporation owns 10% or more of Spirit Airlines, LLC's stock.

The following is a complete list of interested persons pursuant to Eleventh Circuit Rule 26.1-2(a) that have an interest in the outcome of this matter:

1. Feinberg, Adam P., counsel for Petitioner

2. McMenamin, Pamela, Compliance Manager, Office of Revenue, Transportation Security Administration

3. Mehringer, Holly C., Assistant Administrator and Chief Financial Officer, Transportation Security Administration

4. Miller & Chevalier Chartered, counsel for Petitioner

5. Shaw, Weili J., counsel for Respondent

6. Spirit Airlines, LLC (formerly Spirit Airlines, Inc.), Petitioner

7. Spirit Aviation Holdings, Inc. (ticker: FLYY ), owner of Petitioner

---

[1] Petitioner recently changed its name from Spirit Airlines, Inc. to Spirit Airlines, LLC. Petitioner filed a motion to amend the case caption on July 9, 2025 (Doc. No. 16), which is currently pending before the Court.

C-i of ii

8.  Transportation Security Administration, Respondent


*/s/ Adam P. Feinberg*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner Spirit Airlines, LLC respectfully requests oral argument. This case presents a critical question of statutory interpretation that implicates significant sums and presents an ongoing dispute for numerous airlines. At issue is the "security service fee" that Congress authorized Respondent Transportation Security Administration to collect from "passengers of air carriers . . . in air transportation" to fund certain "costs of providing civil aviation security services." 49 U.S.C. § 44940(a)(1). But when customers cancel their tickets, they never becomes "passengers," and they never avail themselves of "aviation security services." Nevertheless, TSA, in the final administrative decision now before this Court, claims that it is entitled to keep the security service fee for the canceled tickets at issue.

Oral argument is likely to assist the Court's consideration of these weighty issues of nationwide import.

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................................C-i

STATEMENT REGARDING ORAL ARGUMENT ..................................................i

TABLE OF AUTHORITIES ................................................................................iv

INTRODUCTION ..................................................................................................1

JURISDICTIONAL STATEMENT ........................................................................3

STATUTORY AND REGULATORY AUTHORITIES ...........................................4

ISSUES PRESENTED............................................................................................4

STATEMENT OF THE CASE................................................................................5

I.     STATUTORY AND REGULATORY BACKGROUND ............................5

     A.     Congress Imposes the Security Service Fee on Airline Passengers to Fund TSA's Security Operations...................................5

     B.     TSA Issues Regulations and Informal Guidance on the Collection and Refunding of Security Service Fees ............................7

II.     FACTUAL AND PROCEDURAL BACKGROUND.................................10

     A.     Spirit Refunds Security Service Fee Amounts When Tickets Are Canceled ................................................................................10

     B.     TSA Audits Spirit and Assesses Liability............................................12

     C.     On Administrative Review, TSA's Chief Financial Officer Determines the Disputed Funds Should Go to TSA ...........................14

III.     STANDARD OF REVIEW.......................................................................15

SUMMARY OF THE ARGUMENT ....................................................................16

ARGUMENT .......................................................................................................18

I.      TSA IS NOT ENTITLED TO SECURITY SERVICE FEES FOR
        CUSTOMERS WHO CANCEL THEIR TICKETS AND NEVER
        TRAVEL ........................................................................................................18

        A.      Section 44940's Operative Provisions Limit TSA's Entitlement
                to Fees to "Passengers" to Fund "Costs of Providing Civil
                Aviation Security Services" ...........................................................19

        B.      Section 44940's Ancillary Provisions Do Not Support TSA's
                View ................................................................................................27

        C.      TSA's Regulations and Informal Guidance Do Not Overcome
                the Statute ......................................................................................31

II.     SPIRIT IS NOT LIABLE BECAUSE IT REFUNDED THE
        SECURITY SERVICE FEES TO THE CUSTOMERS WHEN THEY
        CANCELED THEIR TICKETS ...................................................................34

III.    THE FINAL DECISION SHOULD BE VACATED BECAUSE TSA
        DID NOT PROVIDE FAIR NOTICE OF ITS VIEW THAT
        SPIRIT'S REFUND PROCEDURES ARE INADEQUATE ......................39

        A.      TSA Did Not Give Notice of Its Position to Spirit Until After
                All of the Transactions at Issue .....................................................41

        B.      Spirit Could Not Have Reasonably Guessed TSA's Unnatural
                View of the Law, Which Has Shifted ..............................................43

CONCLUSION .......................................................................................................46

CERTIFICATE OF COMPLIANCE ...............................................................*Post*

ADDENDUM ..................................................................................................*Post*

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airlines for Am. v. Dep't of Transp.*,
  127 F.4th 563 (5th Cir. 2025) ................................................................37

*Bayou Lawn & Landscape Servs. v. Sec'y of Labor*,
  713 F.3d 1080 (11th Cir. 2013) ........................................................19, 33

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988)................................................................................33

*Caver v. Central Alabama Electric Cooperative*,
  845 F.3d 1135 (11th Cir. 2017) ..............................................................36

*Coghlan v. Nat'l Transp. Safety Bd.*,
  470 F.3d 1300 (11th Cir. 2006) ..............................................................15

*Davis v. Cent. Ala. Elec. Coop.*,
  No. 15-0131, 2015 WL 5285894 (S.D. Ala. Sept. 8, 2015)........................35, 36

*Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm'n*,
  528 F.2d 645 (5th Cir. 1976) ..............................................................39, 40

*Diebold, Inc., v. Marshall*,
  585 F.2d 1327 (6th Cir. 1978) ................................................................40

*FAG Italia, S.p.A. v. United States*,
  291 F.3d 806 (Fed. Cir. 2002) ................................................................19

*Feliciano v. Dep't of Transp.*,
  145 S. Ct. 1284 (2025)............................................................................21

*Gen. Elec. Co. v. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995)................................................................40

*Georgia Pac. Corp. v. Occupational Safety & Health Rev. Comm'n*,
  25 F.3d 999 (11th Cir. 1994) ..............................................................40, 42

*Gloucester Ferry Co. v. Pennsylvania*,
  114 U.S. 196 (1885)................................................................................22

iv

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)...................................................................40

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
    968 F.3d 454 (5th Cir. 2020) ....................................................19

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006)...................................................................28

*Jama v. Immigr. Customs Enf't*,
    543 U.S. 335 (2005)...................................................................29

*Jones v. Hendrix*,
    599 U.S. 465 (2023)...................................................................28

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)...................................................................19

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)...................................................................16

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
    595 U.S. 109 (2022)...................................................................19

*Sackett v. EPA*,
    598 U.S. 651 (2023)...................................................................29

*SEC v. Almagarby*,
    92 F.4th 1306 (11th Cir. 2024) .................................................40

*Southwest Airlines Co. v. United States*,
    No. 22-141, 2025 WL 841847 (U.S. Ct. Int'l Trade Mar. 18, 2025),
    *appeal filed*, No. 2025-1797 (Fed. Cir. May 21, 2025)............. 18, 25-28, 30, 33

*Trinity Broad. of Fla., Inc. v. FCC*,
    211 F.3d 618 (D.C. Cir. 2000).................................................41

*Turkiye Halk Bankasi A.S. v. United States*,
    598 U.S. 264 (2023)...............................................................22, 29

*United Airlines, Inc. v. United States*,
    111 F.3d 551 (7th Cir. 1997) .................................................38, 44

v

**Statutes**

19 U.S.C. § 58c ............................................................................25, 26, 28, 30

26 U.S.C. § 4261 ......................................................................................28

26 U.S.C. § 6415 ......................................................................................37

49 U.S.C. § 114 ........................................................................................5

49 U.S.C. § 40102 ..........................................................................20, 21, 24

Aviation and Transportation Security Act,
    49 U.S.C. §§ 44901 *et seq.* ...............................................................5
    49 U.S.C. § 44940..............................1, 3-8, 17-21, 23-24, 27-30, 32-33, 41, 43

49 U.S.C. § 46110 ..................................................................................4, 15

Ala. Code § 37-6-20 ..................................................................................36

Fla. Stat. Ann. § 674.404 ............................................................................44

**Other Authorities**

7 C.F.R. § 1767.41 ....................................................................................37

14 C.F.R. § 399.85 ....................................................................................37

49 C.F.R. § 89.21 ......................................................................................14

49 C.F.R. Part 1510....................................................................................4
    49 C.F.R. § 1510.1 ................................................................................31
    49 C.F.R. § 1510.3 ................................................................................31
    49 C.F.R. § 1510.5 ................................................................................31
    49 C.F.R. § 1510.9 ..............................................................................7, 32
    49 C.F.R. § 1510.11 ............................................................................8, 32
    40 C.F.R. § 1510.13 ..............................................................................32
    49 C.F.R. § 1510.19 ..............................................................................12

Rev. Rul. 70-13, 1970-1 C.B. 272 ..............................................................37

Rev. Rul. 89-109, 1989-2 C.B. 232 ..............................................................37

66 Fed. Reg. 67,698 (Dec. 31, 2001) ..........................................................7

79 Fed. Reg. 35,462 (June 20, 2014) ...........................................................7

89 Fed. Reg. 34,620 (Apr. 30, 2024) ........................................................37

11th Cir. R. 30-2 .........................................................................................3

Fed. R. App. P. 15 ....................................................................................15

The Am. Heritage Dictionary (5th ed. 2012) ...........................................20

Black's Law Dictionary (4th ed. 1968) ....................................................22

Black's Law Dictionary (7th ed. 1999) ....................................................22

Black's Law Dictionary (12th ed. 2024) ........................................20, 21, 22

Merriam-Webster's Collegiate Dictionary (11th ed. 2003)..............20, 22

## INTRODUCTION

This case pits Respondent Transportation Security Administration ("TSA") against the plain text of a statute. The statute – and Petitioner Spirit Airlines, LLC[2] ("Spirit") – should win.

The statute at issue, 49 U.S.C. § 44940, arose in the aftermath of the September 11, 2001, attacks, to fund the newly created TSA through a "security service fee" chargeable to "passengers" travelling through U.S. airports for "air transportation." Spirit, like other airlines, typically collects the security service fee amounts when customers buy their tickets and remits them to TSA on a monthly basis. When a customer cancels a ticket, Spirit refunds the security service fee amount to the customer and nets out any applicable cancellation fee. Any remaining refund amount takes the form either of the original method of payment (typically a credit card) or of a travel credit, known as a "credit shell." Credit shells typically carry expiration dates, and on occasion, a customer would cancel the ticket, receive all or part of the refund in the form of a credit shell, and let the credit shell expire unused.

---

[2] As noted above, Petitioner recently changed its name from Spirit Airlines, Inc. to Spirit Airlines, LLC.  Petitioner filed a motion to amend the case caption on July 9, 2025 (Doc. No. 16), which is currently pending before the Court.

In this dispute, TSA claims that it is entitled to security service fees for customers whose credit shells expired unused – even though those customers canceled their tickets, never became a "passenger," never engaged in "air transportation," never availed themselves of TSA's services, and received a full refund in the form of the credit shell or satisfaction of a cancellation fee or both. TSA is wrong. Section 44940 exists to fund TSA's security services with fees from the people who use those services – "passengers." There is no other plausible way to read the statute: A customer who never becomes a "passenger" does not trigger the security service fee. Spirit should prevail on that basis alone.

And even if a security service fee could be triggered by a customer who cancels a ticket and never travels, that customer received a refund from Spirit. TSA has long taken the position that it is not entitled to a security service fee that is refunded to the customer. Credit shells are refunds just like any other form of store credit. TSA's contrary view maintains that a "refund" turns not on what the merchant issued, but on some future action the customer may or may not take. Put another way, TSA believes that a credit shell is a refund if it gets used, but is not a refund if, at some point in the future, it does not get used. That view finds no support in any statute, regulation, or other law – because it is wrong. Separately, use of the customer's credit to satisfy a cancellation fee also counts as a refund, meaning

2

some customers received two valid types of refunds: a credit shell and satisfaction of a cancellation fee.

What's more, despite previous audits after enactment of the fee statute in 2001, TSA did not explain to Spirit its unsound view that expired credit shells are not "refunds" until after all of the transactions at issue in this case. Congress's pronouncements in section 44940 trump TSA's inconsistent guidance, but regardless, the fair-notice doctrine prohibits TSA from ambushing airlines with a surprising and unnatural reading of the law that runs contrary not only to how airlines have operated for many years, but how countless merchants across innumerable industries handle refunds.

This Court should enforce the statute. The Petition for Review should be granted, TSA's final decision should be set aside, and TSA should be ordered to refund the amount at issue to Spirit.

## JURISDICTIONAL STATEMENT

On December 16, 2024, TSA issued its final agency decision rejecting Spirit's timely request for administrative review. Tab 8_AR190-201.[3] Spirit timely

---

[3] TSA filed a certified index of the documents comprising the Administrative Record. *See* Doc. No. 13 (Apr. 30, 2025). TSA also provided Bates-stamped copies of the Administrative Record to Spirit. Pursuant to 11th Cir. R. 30-2(c), Spirit will file an appendix containing the Administrative Record within seven days of filing of its brief. Citations herein to "Tab #_AR##" are to the documents in that appendix. "Tab

filed a Petition for Review in this Court on February 12, 2025, within the 60-day statutory deadline. 49 U.S.C. § 46110(a). This Court's jurisdiction is invoked under 49 U.S.C. § 46110.

## STATUTORY AND REGULATORY AUTHORITIES

49 U.S.C. § 44940 and 49 C.F.R. Part 1510 are set out in the Addendum following this brief.

## ISSUES PRESENTED

TSA claims it is entitled to security service fees as to tickets that were canceled by customers who never traveled, even though Spirit refunded the security service fees to customers on each canceled ticket, and even though TSA first notified Spirit of its unnatural interpretation of "refund" after all of the transactions at issue.

The issues presented are:

1.     Whether TSA is entitled to security service fees when customers cancel their tickets and never travel.

---

#" refers to the Administrative Record reference number on certified index of the documents comprising the Administrative Record (which will be tabbed accordingly in the appendix). "AR##" refers to TSA's Bates numbers in the lower right corner of each page of the Administrative Record documents.

4

2. Whether TSA is entitled to security service fees when Spirit issued refunds in the form of credits shells that the customers let expire, applied customers' refund credits to satisfy cancellation fees, or both.

3. Whether TSA's final decision should be vacated because TSA never provided Spirit fair notice that its refund practices do not comport with TSA's view of the law.

**STATEMENT OF THE CASE**

This case is about TSA's asserted entitlement to security service fees under 49 U.S.C. § 44940 when no passenger travels because the customer canceled the ticket and received a credit shell (and sometimes also satisfaction of a contractually owed cancelation fee) in exchange for the canceled ticket. As described in more detail below, TSA imposed a liability of $2,838,849.11 against Spirit, *see* Tab 5_AR46, which Spirit contested administratively before TSA, *see* Tab 7_AR50-65. In the final decision under review in this case, Tab 8_AR190-201, TSA upheld the liability assessment.

## I. STATUTORY AND REGULATORY BACKGROUND

### A. Congress Imposes the Security Service Fee on Airline Passengers to Fund TSA's Security Operations

**1.** Following the terrorist attacks of September 11, 2001, Congress enacted the Aviation and Transportation Security Act, 49 U.S.C. §§ 44901 *et seq.*, which established TSA and charged it with maintaining civil aviation security, *see* 49

5

U.S.C. § 114 (outlining the function and responsibilities of TSA).

Congress decided that these new security services would be funded by the people who avail themselves of the services. That policy determination is codified at 49 U.S.C. § 44940. The statute requires TSA to "impose a uniform fee[] on passengers of air carriers and foreign air carriers in air transportation and intrastate air transportation originating at airports in the United States." 49 U.S.C. § 44940(a)(1). Congress made clear that this security service fee applies to "transportation of a passenger." *Id*. § 44940(d)(2).

The security service fee is "to pay for [enumerated] costs of providing civil aviation security services" supplied by TSA, such as airport screening personnel and equipment, air marshals, and training of pilots and flight attendants. *Id*. § 44940(a)(1). Congress directed TSA to "ensure that the fees are reasonably related to [TSA's] costs of providing services rendered." *Id*. § 44940(b). While the statutory scheme gives TSA some flexibility to determine the amount of the security service fee, that discretion is capped at "$5.60 per one-way trip in air transportation or intrastate air transportation that originates at an airport in the United States, except that the fee imposed per round trip shall not exceed $11.20." *Id*. § 44940(c)(1).

**2.** Each airline collects the security service fee from its customers, typically at the time of booking. *See generally id*. § 44940(e)(2) (noting fees collected by air

carrier); 49 C.F.R. § 1510.9(b) (detailing collection of security service fee). The statute requires airlines to remit to TSA the security service fees they collect on a monthly basis. *See* 49 U.S.C. § 44940(e)(3).

## B.   TSA Issues Regulations and Informal Guidance on the Collection and Refunding of Security Service Fees

Following section 44940's enactment in November 2001, TSA issued regulations and informal industry guidance. Three such pronouncements are relevant to this dispute.

**1.** The month after section 44940 was enacted, TSA promulgated an interim final rule to regulate among other things various logistical matters surrounding security-service-fee payments. *See* 66 Fed. Reg. 67,698 (Dec. 31, 2001). TSA amended the regulations in an interim final rule in 2014. *See* 79 Fed. Reg. 35,462 (June 20, 2014). Two regulations are particularly implicated in this case.

First, in 49 C.F.R. § 1510.9, TSA regulates the "[c]ollection of security service fees." It directs air carriers to collect security service fees "based on the air travel itinerary at the time the air transportation is sold." *Id*. § 1510.9(b). It adds that "[a]ny changes by the passenger to the itinerary are subject to additional collection or refund of the security service fee by the direct air carrier or foreign air carrier, as appropriate." *Id*. Like section 44940, section 1510.9 speaks only to "passengers," using that term ten times. It does not elaborate on what constitutes a "refund" as it uses that term in subsection (b).

7

Second, in 49 C.F.R. § 1510.11, TSA addresses "[h]andling of security service fees." It emphasizes the link between security service fees and actual passenger costs, proclaiming that the security service fees collected by airlines "are held in trust by that direct carrier for the beneficial interest of the United States in paying for the costs of providing civil aviation security services described in 49 U.S.C. 44940." *Id*. § 1510.11(b). It adds that an airline "holds neither legal nor equitable interest in the security service fees," with certain exceptions not implicated here. *Id.* Section 1510.11 does not address or define "refund" as that term appears elsewhere in the regulations.

**2.** In November 2002, TSA's Acting Director of Revenue issued what is known as the 2002 guidance letter to an airline trade association. Tab 2_AR3-4. That letter purports to address the refundability of security service fees "to ticket purchasers who do not travel on their scheduled flights, particularly where the tickets are nonrefundable and have no value toward future travel." Tab 2_AR3. The letter states that if a ticket is not used, and if the "ticket purchaser requests a refund of the September 11th Security Fee collected, the carrier must provide the requester with a full refund of the fee." *Id*.

Although the underlying statute relies on the term "passenger" when describing security service fees, the 2002 guidance letter uses the term "purchaser" – which appears nowhere in section 44940 – to discuss refunds. It states that if a

8

carrier remits a security service fee "to TSA and then refunds the fee to a ticket purchaser, the carrier may offset the refund by deducting it from the [fees] remitted to TSA for the month in which the refund is provided." Tab 2_AR4. The 2002 guidance letter also asserts that if "an air carrier does not refund [the security service fees] to the ticket purchaser, the fees must be remitted to or remain with TSA." *Id*.

The 2002 guidance letter, like the regulations, does not define "refund" or provide examples of what types of remittances do or do not constitute a "refund."

Spirit is not and never has been a member of the trade association to which the 2002 guidance letter was sent and had no knowledge of it until after the audit period at issue in this case. Tab 7_AR115.

**3.** Nearly two decades later, in March 2020 (after the audit period at issue in this case), TSA issued another informal guidance document labeled "Guidance to Industry." Tab 3_AR5. Issued at the outset of the COVID-19 pandemic, the 2020 guidance document set out to "uniformly address recent inquiries" and "provide uniform clarification" regarding "refunds to passengers" of the security service fee. *Id*.

This "guidance document" explained: "When requested by a passenger, TSA considers a passenger fee refund a return of payment preferably in the form of original payment." *Id*. TSA then announced its view that "[r]etaining any portion

9

of the fee or providing credit towards future services, with or without an expiration, does not constitute a refund." *Id*. The guidance document cites no authority to support either proposition.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Spirit Refunds Security Service Fee Amounts When Tickets Are Canceled

When a customer purchases a ticket on Spirit, the customer typically pays the airfare, taxes, and the security service fee at the time of booking. If the customer later cancels the ticket, the full amount of the purchase, including all taxes and the security service fee, will be returned either to the original method of purchase (typically a credit card) or to a credit shell, which might be offset by any applicable cancellation fees. Tab 7_AR110-11, Tab 8_AR192. Spirit's agreement with its customers sometimes includes a cancellation fee which, during the relevant time period, was the lesser of $100 or the full price of the ticket. Tab 7_AR110-11, Tab 8_AR192. A customer pays the cancellation fee from the credit that would otherwise be issued as a credit shell, with a credit shell being issued for the remaining credit. Tab 7_AR111, Tab 8_AR192. Even though the cancellation fee might be netted against the credit resulting from the cancellation of a ticket, the fee and the credit are two separate transactions and are reflected as such in Spirit's books and records. Tab 7_AR111-12.

A credit shell is a credit in the customer's name that can be used to purchase Spirit products and services, including but not limited to tickets for transportation – just like a gift card or a store credit. Tab 7_AR111. Credit shells can expire if not used within a certain time, although most credit shells are used by the customer before expiration. Tab 7_AR113-14, Tab 8_AR192.

When Spirit issues either a method-of-payment refund or a credit shell, all of the accounting entries associated with the sale of the ticket are reversed. Tab 7_AR112. That includes removing the amount of the security service fee from its TSA Fee Liability Account because it has been refunded to the customer, resulting in those funds not being paid to TSA. *Id*.; *see also* Tab 8_AR192-93.

When a customer uses a credit shell to purchase a new ticket, it works just like a normal purchase. Tab 7_AR112-13. Spirit collects and remits any applicable security service fees associated with any resulting transportation. *Id*. If a credit shell eventually expires unused, Spirit recognizes the amount of the credit shell as revenue at that time in a separate transaction from the earlier issuance of the credit shell. Tab 7_AR113; *see also* Tab 8_AR192 n.3.

Spirit did things this way for many years prior to the audit at issue in this case, and prior to that audit, TSA had never expressed any concern with how Spirit refunds security service fee amounts on canceled tickets, despite having conducted audits similar to the one at issue here. Tab 7_AR114-15.

11

**B. TSA Audits Spirit and Assesses Liability**

TSA periodically audits airlines for their security-service-fee compliance. *See* 49 C.F.R. § 1510.19. One such audit is at issue here, carried out on TSA's behalf by U.S. Customs and Border Protection ("CBP") audit staff. The audit covered December 2016 through December 2018, and culminated in an audit report dated February 12, 2021. Tab 4_AR6-45.

During the period covered by the audit, Spirit remitted more than $290 million in security service fees to TSA. Tab 4_AR8. After reviewing more than a thousand transactions of different sorts and various aspects of Spirit's security service fee practices, the auditors flagged a single issue relating to canceled tickets. *E.g.*, Tab 4_AR11-12. Specifically, the auditors identified 46 ticket reservations (referred to in the audit as "passenger name records" or "PNRs") "where a credit shell was issued for a canceled flight and expired unused." Tab 4_AR19. Although Spirit's policies had been in place for many years, the auditors treated each of those 46 reservations (which would have involved 87 one-way trips) as "errors." Tab 4_AR19, Tab 4_AR21-27; *see also* AR11-12. The auditors alleged:

> For each identified error, Spirit collected fees from the passenger on behalf of TSA for the security service fees associated with the purchased air transportation. For [the 46] errors identified, the passengers did not use the purchased ticket and were issued a credit shell by Spirit that went unused and eventually expired. Upon expiration of the credit shell, Spirit gained an equitable interest in the collected fees by recognizing the amounts as revenue and neither refunding the fees to the purchaser nor remitting the fees to TSA. . . .

12

. . . The determination as to whether a credit shell constitutes a refund of any collected [security service fees] cannot be made until the credit shell either expires unused or is used to purchase new air transportation . . . .

Tab 4_AR44.

Although the auditors asserted that the supposed "error" ticket reservations involved only 87 security service fees (which is equal to $487.20), the auditors extrapolated those supposed "errors" across Spirit's entire universe of security service fee remittances to calculate a $2,838,849.11 recommended liability associated with those ticket reservations. Tab 4_AR19-20, Tab 4_AR28. The auditors did not treat as "errors" any canceled tickets that were exchanged for credits shells that were later wholly or partially used to purchase new tickets. Tab 4_AR19. Indeed, when Spirit "substantiated that the credit shell was used by the customer prior to expiration," the auditors did not treat the ticket reservations as errors. Tab 4_AR45.

Of the 46 supposed "error" ticket reservations, 34 involved cancellation fees that were owed by the customers and that were paid from the credit resulting from the canceled tickets, with a credit shell being issued for the remaining credit. Tab 7_AR114. In those instances, both the satisfied cancellation fee and the credit shell was higher than the security service fee amount collected from the customer. *Id.*

The auditors cited TSA's regulations and the 2002 guidance letter. Tab 4_AR14-15, Tab 4_AR44. The auditors did not cite the 2020 guidance document, which had been issued less than a year before. As of the end of the audit period on

13

December 31, 2018, Spirit had no knowledge of the 2002 guidance letter, of TSA's view that security service fee amounts on canceled ticket must be refunded to the customer or remitted to TSA, or that TSA believed that neither a credit shell that later expires nor satisfaction of a cancelation fee qualify as refunds. Tab 7_AR115; *see also* Tab 4_AR17.

TSA adopted the audit report and subsequently sent it to Spirit on September 10, 2021, along with a liability assessment in the amount of $2,838,849.11. Tab 5_AR46-48, Tab 6_AR49. Pursuant to 49 C.F.R. § 89.21(f), Spirit sought administrative review of that liability assessment by timely submitting a request for review on October 7, 2021. Tab 7_AR50-65.

### C. On Administrative Review, TSA's Chief Financial Officer Determines the Disputed Funds Should Go to TSA

More than three years after Spirit's request for review, TSA issued a final decision on December 16, 2024. Tab 8_AR190-201. That decision was issued by TSA's own Chief Financial Officer. Due to Spirit's bankruptcy proceeding, TSA did not demand payment at that time. Tab 8_AR201. Subsequently, Spirit emerged from bankruptcy, TSA demanded payment, and Spirit paid the entire $2,838,849.11 liability assessment to TSA on or about April 18, 2025.

The final decision purports to address two of Spirit's main arguments. It first rejects Spirit's position that TSA has authority to obtain funds only when there is a passenger who travels on an aircraft. Tab 8_AR195-96. It next rejects Spirit's

argument that expiring credits shells are refunds and that TSA failed to give fair notice of its contrary interpretation. Tab 8_AR198-201. TSA asserts that "Spirit's contention that creating an expiring credit in the form of [a] credit shell is a refund of the Fee cannot be squared with its regulatory obligations regarding the Fee" and that "[t]his expiring credit arrangement is not a refund of the Fee to the passenger in any material sense, as Spirit has not returned or repaid the Fee amount to the passenger." Tab 8_AR199-200. But the final decision agrees that credit shells constitute refunds when used. Tab 8_AR194, Tab 8_AR198-201. Nowhere in the final decision does TSA define the word "refund" or cite any pre-2020 authority suggesting that expiring credit does not qualify as a refund. Nor does the final decision address Spirit's argument that application of a refund credit to satisfy a cancellation fee qualifies as a refund. *See* Tab 7_AR62-63.

Spirit timely filed this Petition for Review. *See* 49 U.S.C. § 46110(a); Fed. R. App. P. 15(a)(1).

## III. STANDARD OF REVIEW

TSA's "interpretation and application of statutory provisions . . . is reviewed de novo." *Coghlan v. Nat'l Transp. Safety Bd.*, 470 F.3d 1300, 1304 (11th Cir. 2006). As the Supreme Court explained last year, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and "must exercise their independent judgment in determining the

meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394, 412 (2024). That requires this Court to "determine the best reading of the statute"; a merely permissible reading is not enough. *Id*. at 400.

## SUMMARY OF THE ARGUMENT

**I. A.** Agencies are limited to the powers conferred on them by Congress, and here, Congress has never granted TSA the power to retain security service fees as to customers who purchase tickets but later cancel those tickets and never travel. In those situations, the customer never becomes a "passenger." Dictionaries and common usage confirm that "passenger" involves "travel." Likewise, the statutory term "trip" is tied to "a journey." And Congress's reference to "air transportation" necessarily invokes the movement of people from one place to another. None of those concepts applies to someone who cancels a ticket and never flies on an airplane.

Were there any doubt, the statute makes clear that the security service fee exists to pay for the "costs of providing civil aviation security services." This Court has a duty to read statutes holistically, and there is no proper basis to read "passenger," "trip," and "air transportation" divorced from the express funding purpose written into the statutory text. Customers who cancel tickets and never travel do not avail themselves of or incur costs associated with the enumerated security services, which only confirms that such customers fall outside the statutory language.

16

**B.** Section 44940 includes a number of ancillary and administrative provisions, some of which TSA invoked below to support its view. But each is irrelevant on its own terms, and in any event, TSA errs in suggesting that these technical provisions override the operative heart of the security service fee statute.

**C.** TSA's own regulations and informal industry guidance do not overcome the statutory text. For one thing, the regulations largely track the core statutory terms related to "passengers" and "air transportation," all of which support Spirit's view. TSA's other regulations beg the question by assuming the applicability of the security service fee under section 44940(a)(1). And in any event, regulations cannot override statutory pronouncements.

$$* * *$$

Because TSA's final decision conflicts with the operative statute, the Court should vacate the decision. It need not reach the remaining issues.

**II.** There is an alternative basis to vacate the final decision below. Spirit refunded the security service fee amounts to every customer who canceled a ticket in the form of a credit shell, and in some cases also in the form of satisfaction of a cancellation fee. TSA claims that a credit shell is not a refund if it later expires unused, but that untenable position finds no support in any statute or regulation. And it defies reasonable business expectations: "store credit" is a tried-and-true refund

17

method across countless industries. Meanwhile, TSA offers no reason why applying a refund credit to satisfy a cancellation fee is not a refund.

**III.** TSA cannot enforce its counterintuitive interpretation of "refund" – announced only after most of the transactions at issue – against Spirit. The fair-notice doctrine prohibits such retroactive liability.

## ARGUMENT

## I.  TSA IS NOT ENTITLED TO SECURITY SERVICE FEES FOR CUSTOMERS WHO CANCEL THEIR TICKETS AND NEVER TRAVEL

The security service fee statute permits TSA to collect a fee from "passengers of air carriers . . . in air transportation" to fund certain "costs of providing civil aviation security services." 49 U.S.C. § 44940(a)(1). When customers cancel their tickets, they never become "passengers." And they never use "security services." Agreeing with this plain-text reading, the Court of International Trade recently rejected similar arguments advanced by CBP as to an analogous fee regime for international tickets. *See Southwest Airlines Co. v. United States* ("*Southwest Airlines*"), No. 22-141, 2025 WL 841847, at *9 (U.S. Ct. Int'l Trade Mar. 18, 2025), *appeal filed*, No. 2025-1797 (Fed. Cir. May 21, 2025). The easiest way to resolve this Petition is to agree with the Court of International Trade's sound reasoning and vacate the final decision because TSA lacks statutory authorization to retain the security service fee when no passenger travels.

18

### A. Section 44940's Operative Provisions Limit TSA's Entitlement to Fees to "Passengers" to Fund "Costs of Providing Civil Aviation Security Services"

**1.** We begin with first principles. "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). Agencies like TSA "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam). "[C]ongressional silence" does not give an agency authority to act. *Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1084-85 (11th Cir. 2013) (citation omitted); *see also Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 456 (5th Cir. 2020) ("Congress does not delegate authority merely by not withholding it."); *FAG Italia, S.p.A. v. United States*, 291 F.3d 806, 816 (Fed. Cir. 2002) ("the absence of a statutory prohibition cannot be the source of agency authority"; "no case of which we are aware holds that an administrative agency has authority to fill gaps in a statute that exist because of the absence of statutory authority").

The proper way to resolve this dispute is to carefully analyze Congress's pronouncements to determine whether it has entitled TSA to retain security service fees as to customers who purchase tickets but later cancel them and never fly. The text of the statute authorizes TSA to collect a security service fee for a "passenger" who takes a "trip" "in air transportation," in order to fund the "costs of providing

19

civil aviation security services." 49 U.S.C. § 44940(a)(1), (b), (c)(1); *see also id.* § 44940(d)(2) (the security service fee is imposed "on transportation of a passenger"). TSA is not entitled to impose a fee for customers who cancel their tickets and never fly.

*"Passenger."* This statutory term appears both in section 44940(a) and in the statutory definitions of "air transportation." *See* 49 U.S.C. § 40102(a)(23), (a)(25), (a)(27). Black's Law Dictionary defines "passenger" as "[s]omeone who travels in a ship, airplane, boat, vehicle, etc., but without driving it or working aboard it; esp., a person taken by a common carrier under a contract of carriage or with the carrier's consent." *Passenger*, Black's Law Dictionary (12th ed. 2024). Two parts of that definition stand out: *travels* and *taken*. Both imply actual conveyance from one place to another. Ordinary dictionaries similarly focus on "travel." *See, e.g.*, *Passenger*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("passenger" means "a traveler in a public or private conveyance"); *Passenger*, The Am. Heritage Dictionary (5th ed. 2012) ("passenger" means "[a] person who travels in a conveyance, such as a car or train"). The statute itself backs up this everyday meaning when it ties the fee to a "trip." *See* 49 U.S.C. § 44940(c)(1), (2); *Trip*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("trip" is a "voyage" or "journey"); *Trip*, The Am. Heritage Dictionary (5th ed. 2012) ("trip" means "[a] going from one place to another; journey").

20

*"Air transportation."* The fee statute refers to "air transportation" and "intrastate air transportation," the former of which includes "foreign air transportation" and "interstate air transportation." 49 U.S.C. §§ 40102(a)(5), 44940(a)(1). Congress has defined "air transportation" in its intrastate, interstate, and foreign forms. 49 U.S.C. § 40102(a)(23), (a)(25), (a)(27). "[I]nterstate air transportation" means "transportation of passengers or property by aircraft as a common carrier for compensation, or the transportation of mail by aircraft" between States. 49 U.S.C. § 40102(a)(25). "[I]ntrastate air transportation" means "transportation by a common carrier of passengers or property for compensation, entirely in the same State, by turbojet-powered aircraft capable of carrying at least 30 passengers." *Id.* § 40102(a)(27). "[F]oreign air transportation" means "transportation of passengers or property by aircraft as a common carrier for compensation, or the transportation of mail by aircraft, between" the U.S. and a place outside the U.S. *Id.* § 40102(a)(23). All of these definitions explicitly refer to the movement of a passenger (or property or mail) between or within geographic areas.

Because the statute does not provide a special definition of "transportation," courts apply ordinary meaning. *Feliciano v. Dep't of Transp.*, 145 S. Ct. 1284, 1291 (2025). Here, Black's Law Dictionary (12th ed. 2024) defines "transportation" as "the movement of goods or persons from one place to another by a carrier." There is no evidence that Congress intended a different definition in 2001 or

21

when it amended the statute at various points thereafter; indeed, transportation has implied the movement of persons since at least the 19th century. *E.g.*, *Gloucester Ferry Co. v. Pennsylvania*, 114 U.S. 196, 203 (1885) ("Transportation implies the taking up of persons or property at some point and putting them down at another."); *Transportation*, Black's Law Dictionary (7th ed. 1999) (same as the definition in the 12th edition of Black's Law Dictionary); *Transportation*, Black's Law Dictionary (4th ed. 1968) ("transportation" means "[t]he removal of goods or persons from one place to another, by a carrier"); *see also Transportation*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("transportation" is a "means of conveyance or travel from one place to another" and "public conveyance of passengers or goods esp. as a commercial enterprise").

Putting these definitions of "passenger" and "air transportation" together permits only one conclusion: TSA is entitled to the security service fee for a customer who actually travels, that is, is transported from one place to another. Nothing in the statute authorizes TSA to retain security fees as to individuals who are not transported from one place to another and have therefore not used TSA's security services.

***"Costs of providing civil aviation security services."*** This Court has a "duty to construe statutes, not isolated provisions." *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) (citation and internal quotation marks omitted).

Accordingly, "passenger" and "air transportation" must be read in conjunction with the express statutory purpose of the fee: "pay[ing] for" the "costs" of TSA's "security services." 49 U.S.C. § 44940(a)(1). Those "costs" include salary, background checks, and training for screening personnel; the cost of the air marshals program; and the cost of training pilots and flight attendants. *Id.* § 44940(a)(1). A person who never reaches the airport never contributes to any of those costs. And since Congress declared that the security service fee must be "reasonably related to [TSA's] costs of providing services rendered," *id*. § 44940(b), the only conclusion is that no fee applies to a customer who never actually travels.[4]

**2.** The agency's final decision now before this Court has no answer to this statutory analysis. To the extent the decision engages the statutory text at all, it claims that the statutory "phrase 'in air transportation' describes the types of air carrier operations that are covered, rather than the passengers themselves." Tab 8_AR195 (quoting 49 U.S.C. § 44940(a)(1)). This argument fails for multiple reasons.

---

[4] Reinforcing the connection between the security service fee and TSA's security screening, Congress made the fee apply only to transportation "originating at airports in the United States" and expressly authorized an exemption for "any passenger enplaning at an airport in the United States that does not receive screening services." 49 U.S.C. § 44940(a)(1), (h).

23

As an initial matter, even if TSA were correct that the phrase "in air transportation" as used in 49 U.S.C. § 44940(a)(1) refers to the type of air carrier operations to which the security service fee applies, there must still be a "passenger of" such a carrier in order for a security service fee to be imposed. Here, when customers cancel the ticket before they travel, they never become "passengers." TSA cannot escape that term. And TSA offers no answer at all to the express statutory purpose of the security service fee to fund TSA's actual costs of security services provided to those "passengers."

Moreover, the term "air carrier" itself is defined in the statutory scheme as one "undertaking . . . to provide air transportation." 49 U.S.C. § 40102(a)(2), (21). And as set out above, the term *transportation* is necessarily tied to someone or something being transported – a passenger. Even if Congress were concerned with "the type of air carrier operations," that statutory language still requires someone to actually travel before a fee can be imposed. And, for the reasons above, the more natural reading of the text refers to the conduct in which passengers must engage in order to trigger a security service fee.

In any event, the decision below overlooks subsection (c)(1)'s requirement that there be a "trip in air transportation." There is no mention of "carrier" or carrier operations in that subsection, so that cannot be what the phrase "in air

24

transportation" is describing. Instead, "in air transportation" modifies the word "trip," which in this context means "to make a journey," as discussed above.

Finally, it bears emphasis that TSA's position leads to absurd results. TSA had staked out the position that "unambiguous" statutory text entitles TSA to the security service fee "when air transportation is sold . . . irrespective of actual travel." Tab 8_AR195 (capitalization altered). But if that were true, then TSA would be entitled to the security service fee even as to refundable tickets that are canceled and refunded to the customer's original method of payment in full. That cannot be right, as TSA's 2002 guidance letter admits. *Cf. Southwest Airlines*, 2025 WL 841847, at *7 ("the Government's interpretation of the statutory language suggests that CBP would be entitled to a fee regardless of whether the carrier issues a refund"). This Court should not indulge TSA's Janus-faced claims that customers are always entitled to refunds upon request, and yet TSA earns entitlement to fees when they are collected regardless of what happens later.

**3.** The Court of International Trade endorsed the same reasoning Spirit advances here in ruling for Southwest Airlines in a similar challenge involving an analogous fee regime administered by U.S. Customs and Border Protection. The Court of International Trade considered whether CBP was entitled to customs inspection fees collected for certain international airline tickets that were later canceled and never used. *See id.* at *6. The relevant statute, 19 U.S.C. § 58c(a)(5)(A),

authorizes CBP to collect fees "for the provision of customs services in connection with . . . the arrival of each passenger aboard a . . . commercial aircraft from a place outside the United States." The statute also contains a collection provision requiring airlines to collect the fee when the ticket is issued and remit it to CBP. *See* 19 U.S.C. § 58c(d).

Like TSA here, the government in *Southwest Airlines* argued that once an airline collects the fee, it must remit it to the agency, whether or not the passenger ever flies. But the court squarely rejected that reasoning. Carefully parsing the statutory text, context, and structure, the court concluded that CBP is entitled to a fee only when a passenger actually arrives on a plane in the United States and CBP provides customs services in connection with that arrival. 2025 WL 841847, at *5-7. It reasoned that an interpretation like the government's – that detached the fee from the services it was designed to compensate – was inconsistent with the statute. *Id.* at *6. As the court explained, the "collection" provision cannot override the central condition for the fee – that there be an arriving passenger to whom CBP can provide services. *Id.*

The court also pointed to CBP's own audit practices to reinforce its reading. CBP sought to recover fees only for tickets that were canceled for travel credits that were never used. It did not demand payment for canceled tickets where the travel credits were later used to purchase travel. That enforcement pattern

confirmed what the statute already showed: CBP has no claim to a fee where no passenger arrives and where no customs services are rendered. *Id.* at *7.

This Court should follow the same chain of reasoning. When a fee is conditioned on the agency providing a particular service to a particular type of person, and the service is never provided because the type of person does not materialize, the agency cannot keep the fee.

### B.    Section 44940's Ancillary Provisions Do Not Support TSA's View

Unable to contest the core operative language of section 44940(a), the final decision below looked instead to a different subsection: the administrative provisions set out in section 44940(e). According to the decision below, these provisions "unambiguously" state "that it is when air transportation is sold that '[a] fee imposed under subsection (a)(1) shall be collected by the air carrier.'" Tab 8_AR196 (emphasis omitted) (quoting 49 U.S.C. § 44940(e)(2)). TSA appears to reason that if the security service fee must be collected at the time of sale, then whether the purchaser ultimately becomes a "passenger" is irrelevant. Tab 8_AR193; *see also* Tab 8_AR195-96.

This argument is wrong for at least two reasons.

**1.** The statute does not require air carriers to impose the fee when the ticket is sold, and TSA errs badly in suggesting otherwise. Tab 8_AR193 (claiming that section 44940(e)(2) obligates an airline to "collect[] the Fee when air

27

transportation is sold"). Instead, that statutory provision reads: "A fee imposed under subsection (a)(1) shall be collected by the air carrier or foreign air carrier that sells a ticket for transportation described in subsection (a)(1)." 49 U.S.C. § 44940(e)(2). This provision addresses only *who* is responsible for collecting the security service fee (the "carrier that sells a ticket"), not *when* the fee must be collected.

When Congress wants to apply a tax or fee when a product is sold, it knows how to do so in clear language. Take, for example, the customs user fee statute at issue in the *Southwest Airlines* dispute recently decided by the Court of International Trade. That statute directs sellers to "collect from that individual the fee charged under subsection (a)(5) *at the time the document or ticket is issued*." 19 U.S.C. § 58c(d)(1)(A) (emphasis added). Congress could have used similar language in the security service fee statute, but it did not. *See Jones v. Hendrix*, 599 U.S. 465, 477-78 (2023) (stating that Congress knows how to use particular language and where Congress omits words used in other statutes or provisions of the same statute, it intentionally does so); *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006).

Similarly, 26 U.S.C. § 4261(a), (b)(1), and (c)(1) impose excise taxes on the "amount paid" by customers for various types of transportation, thereby triggering

28

the tax upon the sale of the ticket. Again, Congress could have used similar language in section 44940(e)(2) but chose not to.

**2.** Even if TSA were correct that air carriers must impose the fee at the point of sale, there is no plausible basis to conclude that ancillary provisions buried in subsection (e)(2)'s administrative nuts-and-bolts override the core operative provision at the heart of the law. This Court must assess statutes as a whole, not cherry-pick isolated terms. *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023). And as set out above, the heart of the security fee statute is subsection (a)(1), which refers to passengers, transportation, and the security service fee's purpose of funding services used by passengers who actually travel. And other provisions refer to the (a)(1) fee as applying to a "trip" or "transportation of a passenger." 49 U.S.C. § 44940(c)(1), (d)(2). To disregard those overwhelming statements of congressional intent in favor of isolated back-end provisions defies bedrock rules of statutory interpretation. *See Sackett v. EPA*, 598 U.S. 651, 677 (2023) (holding that Congress does not alter "'the fundamental details of a regulatory scheme in vague terms or ancillary provisions'" (citation omitted)); *see also Jama v. Immigr. Customs Enf't*, 543 U.S. 335, 344 (2005) (noting that statutory language in an indented subpart relates only to that subpart); *Turkiye Halk Bankasi*, 598 U.S. at 275.

The Court of International Trade recently recognized as much in the analogous user-fee dispute involving Southwest Airlines. As noted above, unlike section 44940, the customs user fee statute actually requires an airline to collect the customs user fee "at the time the document or ticket is issued." 19 U.S.C. § 58c(d)(1)(A). And, similar to 49 U.S.C. § 44940(e)(1) and (3), the customs user fee statute generally requires airlines to remit collected fees to the government. 19 U.S.C. § 58c(d)(3).

Nonetheless, the Court of International Trade held that the "statute as a whole provides that CBP is entitled to the fee based on the provision of customs services in connection with the arrival of a passenger, not upon the carrier's collection of the funds." *Southwest Airlines*, 2025 WL 841847, at *6. The Court of International Trade explained:

> [A]n interpretation of [19 U.S.C. § 58c(d)] that would entitle CBP to funds based on collection alone relies on a single, isolated provision within the statute. The text upon which the Government relies appears in a "collection" provision describing the general process for collection and remittance and does not dictate whether CBP is entitled to the funds. This provision cannot be read in isolation to suggest that CBP's entitlement to the fee is based entirely on the mere collection of the funds when the rest of the statute continuously connects the fee to the customs services rendered in connection with the arrival of each passenger.

*Id*. (citations omitted). The same is true here, even assuming arguendo that 49 U.S.C. § 44940(e) requires the collection of a security service fee at the time the ticket is sold (which it does not).

30

## C. TSA's Regulations and Informal Guidance Do Not Overcome the Statute

To the extent TSA claims entitlement to the disputed fee amounts based not on the statute, but on its own regulations and informal guidance, TSA errs.[5]

**1.** As an initial matter, TSA's own regulations largely track the statutory language and doom TSA's position for the same reasons. For example, 49 C.F.R. § 1510.1 emphasizes, just like the statute, that the security service fee is "to be paid by passengers . . . in air transportation." Likewise, 49 C.F.R. § 1510.5(a) limits security service fees to "$5.60 per one-way trip for air transportation originating at an airport in the United States," not to exceed "$11.20 per round trip." Another regulation defines "air transportation" as "the carriage by aircraft of persons for compensation or hire." *Id*. § 1510.3.

Accordingly, as with the underlying statute, the regulations provide that no amount is owed to TSA unless there is a "trip" and a "passenger" and unless that passenger was "carri[ed] by aircraft," none of which occurs if the ticket is canceled.

**2.** Undaunted, TSA invokes numerous regulations governing other aspects of the security service fee. *See, e.g.*, Tab 2_AR3, Tab 8_AR194, Tab 8_AR196-98.

---

[5] Even if TSA's regulations and informal guidance could overcome statutory text, which it cannot, their application here against Spirit would violate the fair-notice doctrine, for the reasons explained below in Part III.

31

Most of these provisions do not address whether a customer who cancels the ticket and does not travel can qualify as a "passenger." Instead, these provisions *assume* the applicability of a security service fee under 49 U.S.C. § 44940(a)(1). *See* 49 C.F.R. § 1510.11(b) ("[s]ecurity service fees"); *id.* § 1510.11(c) ("security service fees"); *id.* § 1510.13(a) ("security service fees"); *id.* § 1510.13(c) ("security service fees"). TSA's reliance on these provisions simply begs the question.

The last regulatory provision TSA cites – section 1510.9(b) – affirmatively contradicts its position. Under that provision, the security service fee is initially "based on the air travel itinerary at the time the air transportation is sold," but "[a]ny changes by the passenger to the itinerary" can result in "additional collection or refund of the security service fee." 49 C.F.R. § 1510.9(b). Far from entitling TSA to a security service fee for canceled tickets, this provision makes clear that, even in TSA's view, the final security service fee must be based on travel that actually occurs, not merely an initial itinerary. Moreover, the regulation speaks to itinerary "changes," not cancellations. The regulation does not require Spirit to change the way it handles *canceled* tickets, let alone support TSA's claim to fee amounts associated with those cancellations.

In any event, even if these regulations supported TSA's position (and they do not), they would remain irrelevant. Regulations do not trump statutes. It is "axiomatic that an agency's power to promulgate legislative regulations is limited to

32

the authority delegated to it by Congress." *Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1084-85 (11th Cir. 2013) (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)). "[C]ongressional silence" is not "a sufficient basis upon which an agency may build a rulemaking authority." *Id*. at 1085 (citation omitted). Here, Congress limited the security service fee to "passengers," 49 U.S.C. § 44940(a)(1), and nothing TSA inserts into the Code of Federal Regulations can change that. Much less can TSA's "guidance documents," *see* Tab 2_AR3-4, Tab 3_AR5, override statutory limits. *See Southwest Airlines*, 2025 WL 841847, at *8 ("the Guidance Letters cannot be read to independently grant CBP the authority to collect customs inspection fees where no passenger travels and CBP provides no customs services").

* * *

Congress has never authorized TSA to retain security service fees under the circumstances presented here. And TSA not only lacks power to authorize itself to collect fees contrary to congressional authorization, but it has not even tried to do so here. That ends this case. The Court should grant the Petition for Review, vacate the final decision, and order TSA to return the disputed funds to Spirit.

33

## II. SPIRIT IS NOT LIABLE BECAUSE IT REFUNDED THE SECURITY SERVICE FEES TO THE CUSTOMERS WHEN THEY CANCELED THEIR TICKETS

The most straightforward way to resolve this Petition is to hold that Congress has not authorized security service fees when customers cancel the ticket and never become passengers on a plane. But TSA is wrong for a second, independent reason too: Spirit refunded the security service fee amounts to each customer in the form of credit shell and, in some cases, also in the form of satisfaction of a cancellation fee.

That matters because TSA concedes that it is not entitled to a security service fee for a canceled ticket if Spirit refunds the fee amount to the customer. *See* Tab 2_AR4 (allowing an "offset" if a carrier "refunds the fee to a ticket purchaser"); Tab 3_AR5 (allowing "air carriers to offset Passenger Fee refunds to passengers").

TSA further agrees that, although "refund" is not defined in any statute or regulation, a credit shell counts as a refund if the customer uses that credit shell to purchase a new ticket. The audit did not find fault with any transactions in which the customer used a credit shell before it expired. Instead, all of the 46 alleged "errors" involve credit shells that later expired unused. *E.g.*, Tab 4_AR19, Tab 4_AR21-27, Tab 4_AR44; *cf*, Tab 4_AR45 (not treating as "errors" tickets canceled in exchanged for credit shells that were utilized). In the auditors' view,

34

"whether a credit shell constitutes a refund" depends on whether the credit shell "expires unused or is used to purchase new air transportation." Tab 4_AR44. Thus, TSA's final decision in this case was based on the fact that the credit shells at issue "ultimately expired." Tab 8_AR194; *see also, e.g.*, Tab 8_AR197 ("when a credit shell expires"); Tab 8_AR198-99, Tab 8_AR200 ("an expiring credit shell"); Tab 8_AR199-200 ("expiring credit").

As explained above, all of the 46 supposed "errors" in the audit involved canceled tickets for which credit shells were issued as a refund (after a cancelation fee, if applicable, was offset against the credit) and the credit shell later expired. In each instance, the credit shell exceeded the security service fee amount originally collected from the customer. Tab 7_AR114. Those credit shells are valid refunds when issued.

TSA's effort to exclude unused credit shells from the meaning of "refunds" is inconsistent with the well-settled principle that merchants' credits are a refund. "[T]he plain ordinary meaning of a 'refund' encompasses concepts of distribution by either cash or credit" and "[r]efunds may be issued in cash or in credit." *Davis v. Cent. Ala. Elec. Coop.*, No. 15-0131, 2015 WL 5285894, at *5 n.7 (S.D. Ala. Sept. 8, 2015). "For example, modern consumers who return purchases to retailers are well accustomed to receiving refunds in the form of store credit, rather than

cash." *Id.* "Innumerable examples can be found – both inside and outside the law – of 'refunds' made via credit to an account rather than cash on the barrelhead." *Id.*

This Court's decision in *Caver v. Central Alabama Electric Cooperative*, 845 F.3d 1135 (11th Cir. 2017), also shows that refunds can come in the form of credit, even credit that might later lose its value. That case dealt with a state statute requiring an electric cooperative to distribute its "excess revenues" to its members either via "'patronage refunds'" or "'general rate reductions.'" *Id.* at 1147 (quoting Ala. Code § 37-6-20). A member sued the cooperative because it distributed excess revenues to its members via "credits to their capital accounts, as opposed to making cash payments." *Id.* at 1138; *see also id.* at 1147. The credits were not paid out "in cash for years. Sometimes those payouts come as late as thirty years after the credits are earned and when the members to whom they are owed can no longer be found." *Id.* at 1141. This Court nonetheless held that the credits qualified as patronage refunds. *Id.* at 1147-48. The Court noted that the statute did not "define the term 'patronage refund'" and did not expressly "require a cash payment," and the Court reasoned that "[n]othing in the statute imposes the specific requirement that all patronage refunds be made in a cash manner." *Id.* at 1147. The same is true here.

Federal agencies often treat credit as a refund. For example, the Department of Transportation requires airlines to disclose a "summary of the applicable policy

36

regarding the form of the refund for a change or cancellation (e.g., a credit to the original form of payment, airline credits or voucher) that apply." 14 C.F.R. § 399.85(f)(2);[6] *see also* 89 Fed. Reg. 34620, 34651 (Apr. 30, 2024) (consumer group asked DOT "to require that airlines and ticket agents display information on whether any refund provided would be as a cash or a cash equivalent, non-expiring travel credits or vouchers, or expiring travel credits or vouchers").

Similarly, the Department of Agriculture describes "[i]nsurance policy refunds from mutual companies" as including "credits against subsequent purchases." 7 C.F.R. § 1767.41, 505.1. And the IRS has repeatedly held that merchant credits of various sorts qualify as "refunds." *See, e.g.*, Rev. Rul. 70-13, 1970-1 C.B. 272 (holding that a credit to a customer's capital account qualified as a refund under 26 U.S.C. § 6415(a)); Rev. Rul. 89-109, 1989-2 C.B. 232, 233 (approving "a refund by credit rather than by cash").

None of these sources supports TSA's view that whether Spirit's issuance of a credit shell is a refund depends on the *customer's* future decisions about using

---

[6] The regulation is currently stayed by order of the Fifth Circuit so DOT can consider comments regarding data DOT considered but which were not available during the notice-and-comment period. *Airlines for Am. v. Dep't of Transp.*, 127 F.4th 563, 582 & n.15 (5th Cir. 2025). The court's reasoning had nothing to do with whether credit can qualify as a refund.

that credit shell. The Court should reject TSA's gerrymandered definition of "re-fund."

Separately, Spirit provided a refund in connection with 34 of the 46 supposed "errors" for an additional reason: Spirit applied the refund credit to which the customers were entitled to satisfy a contractual cancellation fee. Each of the cancellation fees paid in this manner exceeded the security service fee amount originally collected from the customer. Tab 7_AR114. Those too are valid refunds.

Spirit's application of the customers' refund credit to pay a contractual cancellation fee is just like the situation in *United Airlines, Inc. v. United States*, 111 F.3d 551 (7th Cir. 1997). That case involved a dispute about whether "United refunded the full amount of the tax it had collected from the customer." *Id*. at 552. United's customers had canceled their tickets and were subject to cancellation fees. For some types of tickets, the cancellation fees were less than 100% of the amount paid for the ticket. But if the ticket was for travel from the continental United States to Hawaii, the cancellation fee was 100% of the amount paid for the ticket, including taxes and fees. The cancellation fees – both the 100% fee and the lower ones – were automatically deducted from the refunds given to the customers. Thus, customers subject to the 100% cancellation fee received no money back after they canceled their tickets, and other customers received a reduced amount. Nonetheless, the Seventh Circuit held that, in all cases, full refunds were given because the

38

refund and the imposition of the cancellation fee were two separate transactions that were simply netted against each other. The same is true here. Tab 7_AR111-12.

## III. THE FINAL DECISION SHOULD BE VACATED BECAUSE TSA DID NOT PROVIDE FAIR NOTICE OF ITS VIEW THAT SPIRIT'S RE-FUND PROCEDURES ARE INADEQUATE

Because TSA's decision rests on a previously unannounced interpretation of "refund," it is unlawful due to TSA's failure to provide fair notice. Spirit previously implemented the security service fee in a straightforward way based on plain statutory text. TSA now advances a different view of the law, but it cannot retroactively fault Spirit and demand substantial sums based on an unexplained agency position.

"[S]tatutes and regulations which allow monetary penalties against those who violate them . . . must give . . . fair warning of the conduct it prohibits or requires, and it must provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents." *Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976). "An enforcement action may violate due process if the defendant does 'not have fair notice of the agency's interpretation' of a law or statute, even if that

39

interpretation is reasonable." *SEC v. Almagarby*, 92 F.4th 1306, 1319 (11th Cir. 2024) (quoting *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1331 (D.C. Cir. 1995)).

A statute or regulation violates due process "if it 'forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Georgia Pac. Corp. v. Occupational Safety & Health Rev. Comm'n*, 25 F.3d 999, 1005 (11th Cir. 1994) (citation omitted). Fair notice requires that the statute or regulation "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The doctrine bars punishing a regulated entity unless "a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform." *Gen. Elec. Co. v. EPA*, 53 F.3d at 1329; *see also Georgia Pac. Corp.*, 25 F.3d at 1005 (Secretary of Labor "retains the responsibility to state with ascertainable certainty what is meant by the standards she has promulgated") (citing *Diamond Roofing Co.*, 528 F.2d at 649).

Even where the agency's interpretation is "the most reasonable of the available alternatives," the fair notice doctrine prohibits punishment if the regulations do not "give an adequate warning of what they command or forbid." *Diebold, Inc., v. Marshall*, 585 F.2d 1327, 1334, 1335 (6th Cir. 1978); *see also Gen. Elec. Co.*, 53

40

F.3d at 1333-34; *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 632 (D.C. Cir. 2000).

Here, the record shows (and TSA has never disputed) that Spirit previously handled credit shells issued in exchange for canceled tickets the same way for many years, that TSA repeatedly conducted similar audits of Spirit prior to the one at issue, but that TSA never raised an issue before that audit. Tab 7_AR114-15. Yet TSA now claims that Spirit's practices have been unlawful all along.

### A. TSA Did Not Give Notice of Its Position to Spirit Until After All of the Transactions at Issue

Today, TSA advances the view that expired credit shells are not refunds, thereby entitling TSA to an associated security service fee. Its first effort to publicly explain that position came in the informal 2020 guidance document discussed above. Tab 3_AR5. That document claims, without citing any authority, that: "Retaining any portion of the fee or providing credit towards future services, with or without an expiration, does not constitute a refund. If an air carrier does not refund the Passenger Fee to the passenger, the fee shall be remitted or remain with TSA." *Id*. (emphasis omitted). Until that moment, TSA had not publicly expressed any indication of its view that expired credits do not constitute refunds.

If there is a reason TSA could not publicly express that position until 2020, it has never articulated it. TSA has been aware of legal questions associated with the security service fee from the moment Congress enacted section 44940. As set

41

out above, TSA issued both regulations and an informal 2002 guidance letter, both purporting to address the collection and refunding of security service fees. Neither suggested that credits like credit shells are not refunds when they expire unused. And in the nearly two decades between the 2002 guidance letter and the 2020 guidance document, TSA never once expressed any view that Spirit's refund practices did not comport with the security fee statute, except for in the audit that is at issue in this case. Tab 7_AR114-15.

The fair notice doctrine thus dooms the final decision under review here. In its Petition, Spirit challenges TSA's final decision as to an audit covering December 2016 through December 2018. *See, e.g.*, Tab 4_AR8, Tab 7_AR50, Tab 8_AR190. Thus, all of the transactions at issue took place before the March 20, 2020 guidance document. Separately, other than in the audit at issue here, TSA had never expressed the view that applying credit to satisfy a cancellation fee did not qualify as a refund. Tab 7_AR115. Further, TSA never sent Spirit the 2002 guidance letter, and Spirit had no knowledge of it until the audit at issue. *Id*. Even if Spirit had seen the 2002 guidance letter, it says nothing at all about expiring credits not qualifying as refunds. Tab 2_AR3-4. Accordingly, TSA's final decision imposing significant financial liability should be vacated. *Georgia Pac. Corp.*, 25 F.3d at 1005-06.

42

**B. Spirit Could Not Have Reasonably Guessed TSA's Unnatural View of the Law, Which Has Shifted**

It was especially important that TSA provide fair notice because its legal position does not comport with the plain language of the statute or common business practice. As explained above, TSA entirely ignores the limited nature of its authority to impose the security service fee only "on passengers," 49 U.S.C. § 44940(a)(1), and it claims that when a credit shell expires unused, the associated fee amount is not actually refunded and thus "belongs to the United States." Tab 8_AR200. No industry participant could have reasonably foreseen such an unnatural view of the law, which runs contrary to how countless industries handle refunds.

**1.** TSA promotes a definition of "refund" that depends not on what the merchant issues at the moment of issuance, but on what the customer does with it in the future: "The determination as to whether a credit shell constitutes a refund . . . cannot be made until the credit shell either expires unused or is used to purchase new [air] transportation . . . ." Tab 4_AR44. A simple hypothetical illustrates why that position makes no sense. Suppose a customer buys a refundable ticket in cash. The customer's plans then change, and the customer cancels the ticket. The airline does not issue cash refunds; it writes the customer a check for the full amount the customer paid. But the customer never gets around to visiting the bank to cash the check, and the check expires unused, like all checks eventually do when they are

43

not cashed. *See, e.g.*, Fla. Stat. Ann. § 674.404 ("A bank is under no obligation to a customer having a checking account to pay a check, other than a certified check, which is presented more than 6 months after its date; but it may charge its customer's account for a payment made thereafter in good faith."). Would any ordinary English speaker dispute that the customer received a refund? Of course not. Yet TSA's position would require the conclusion that the uncashed check *foreclosed* a refund, because whether a remittance counts as a refund depends entirely on what the recipient does with it. *See* Tab 4_AR44; *cf. United Airlines, Inc. v. United States*, 111 F.3d 551, 553-55 (7th Cir. 1997) (rejecting a similar view in the taxation context).

TSA's view not only departs from common usage but also invites all sorts of practical problems. Suppose a Spirit customer cancels a ticket, receives a credit shell, and uses that credit shell to purchase a new ticket. In that instance, according to TSA, the credit shell counts as a refund, meaning the security service fee is paid only once, not twice. But if a customer cancels a ticket, receives a credit shell that expires unused, and purchases the new ticket in cash, TSA claims that the security service fee should be paid twice, not once. *See* Tab 8_AR194 (claiming that "[f]ee amounts . . . were not returned directly to the passengers" when credit shells "ultimately expired"). It is hard to imagine how that view could be correct: in both

44

scenarios, the customer becomes a passenger only once, yet in the latter scenario, TSA gets double the fee.

**2.** The 2020 guidance document stated that "providing credit towards future services, with or without an expiration, does not constitute a refund." Tab 3_AR5. Less than a year later, the audit report takes a different view and concludes that "[t]he determination as to whether a credit shell constitutes a refund of any collected TSA Security Fees cannot be made until the credit shell either expires unused or is used to purchase new air transportation." Tab 4_AR44. The final decision adopts that view; it contends only that expired credit shells fail to qualify as refunds. Tab 8_AR194, Tab 8_AR198-200. It is difficult to understand how any airline can be expected to make sense of this shifting regulatory landscape.

**3.** There should be no doubt that Spirit was eminently reasonable to expect that TSA would consider credit shells to be a refund regardless of the customer's actions. A credit shell is no different from "store credit," the typical approach to refunds in countless industries, as discussed above. No one knew or could have reasonably imagined that TSA would treat a credit shell as a refund only if the customer uses it before it expires.

It thus is no surprise that multiple airlines are currently in litigation against TSA over this same issue. There are petitions for review pending in at least three other circuits, all contesting TSA's view of the security service fee statute and

45

what qualifies as a refund. *See Alaska Airlines, Inc. v. Transp. Sec. Admin.*, No. 25-954 (9th Cir. filed Feb. 13, 2025); *Allegiant Travel Co. v. Transp. Sec. Admin.*, No. 25-960 (9th Cir. filed Feb. 13, 2025); *Frontier Airlines, Inc. v. Dep't of Homeland Sec.*, No. 25-9523 (10th Cir. filed Feb. 12, 2025); *Southwest Airlines Co. v. Transp. Sec. Admin.*, No. 25-60052 (5th Cir. filed Jan. 30, 2025). TSA owed the air transportation industry better than to advance an unnatural reading of a critical statute and wield it to retroactively demand substantial sums in unearned fees for security services it never provided.

## CONCLUSION

The Petition for Review should be granted, TSA's final decision should be set aside, and TSA should be ordered to refund the amounts at issue to Spirit.

July 10, 2025

Respectfully submitted.

*/s/ Adam P. Feinberg*
Adam P. Feinberg
  *Counsel of Record*
Miller & Chevalier Chartered
900 Sixteenth St. NW
Washington, DC 20006
Tel. (202) 626-5800
Fax. (202) 626-5801
afeinberg@milchev.com

## CERTIFICATE OF COMPLIANCE

### Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    [X] this document contains <u>10,884</u> words,

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

    [X] this document has been prepared in a proportionally spaced typeface using Microsoft Office 365, in Times New Roman 14-point typeface.


July 10, 2025                 <u>*/s/ Adam P. Feinberg*</u>
                                     Adam P. Feinberg
                                       *Counsel for Petitioner Spirit Airlines, LLC*

# ADDENDUM

## **TABLE OF CONTENTS**

**Addendum Page**

49 U.S.C. § 44940.  Security Service Fee.................................................................1

49 C.F.R. § 1510.1.  Applicability and purpose. ......................................................6

49 C.F.R. § 1510.3.  Definitions. .............................................................................7

49 C.F.R. § 1510.5.  Imposition of security service fees.........................................10

49 C.F.R. § 1510.7.  Air transportation advertisements and solicitations..............11

49 C.F.R. § 1510.9.  Collection of security service fees. .......................................12

49 C.F.R. § 1510.11.  Handling of security service fees. .......................................13

49 C.F.R. § 1510.13.  Remittance of security service fees......................................14

49 C.F.R. § 1510.15.  Accounting and auditing requirements. ...............................15

49 C.F.R. § 1510.17.  Reporting requirements........................................................16

49 C.F.R. § 1510.19.  Federal oversight..................................................................17

49 C.F.R. § 1510.21.  Enforcement. .......................................................................18

**49 U.S.C. § 44940.  Security Service Fee.**

**(a) General authority.--**

**(1) Passenger fees.**--The Administrator of the Transportation Security Administration shall impose a uniform fee, on passengers of air carriers and foreign air carriers in air transportation and intrastate air transportation originating at airports in the United States, to pay for the following costs of providing civil aviation security services:

**(A)** Salary, benefits, overtime, retirement and other costs of screening personnel, their supervisors and managers, and Federal law enforcement personnel deployed at airport security screening locations under section 44901.

**(B)** The costs of training personnel described in subparagraph (A), and the acquisition, operation, and maintenance of equipment used by such personnel.

**(C)** The costs of performing background investigations of personnel described in subparagraphs (A), (D), (F), and (G).

**(D)** The costs of the Federal air marshals program.

**(E)** The costs of performing civil aviation security research and development under this title.

**(F)** The costs of Federal Security Managers under section 44903.

**(G)** The costs of deploying Federal law enforcement personnel pursuant to section 44903(h).

**(H)** The costs of security-related capital improvements at airports.

**(I)** The costs of training pilots and flight attendants under sections 44918 and 44921.

**(2) Determination of costs.**--

**(A) In general.**--The amount of the costs under paragraph (1) shall be determined by the Administrator of the Transportation Security Administration and shall not be subject to judicial review.

**(B) Definition of Federal law enforcement personnel.**--For purposes of paragraph (1)(A), the term "Federal law enforcement personnel" includes State and local law enforcement officers who are deputized under section 44922.

**(b) Schedule of fees.**--In imposing fees under subsection (a), the Administrator of the Transportation Security Administration shall ensure that the fees are reasonably related to the Transportation Security Administration's costs of providing services rendered.

**(c) Limitation on fee.**--

**(1) Amount.**--Fees imposed under subsection (a)(1) shall be $5.60 per one-way trip in air transportation or intrastate air transportation that originates at an airport in the United States, except that the fee imposed per round trip shall not exceed $11.20.

**(2) Definition of round trip.**--In this subsection, the term "round trip" means a trip on an air travel itinerary that terminates or has a stopover at the origin point (or co-terminal).

**(3) Offsetting collections.**--Beginning on October 1, 2027, fees collected under subsection (a)(1) for any fiscal year shall be credited as offsetting collections to appropriations made for aviation security measures carried out by the Transportation Security Administration, to remain available until expended.

**(d) Imposition of fee.**--

**(1) In general.**--Notwithstanding section 9701 of title 31 and the procedural requirements of section 553 of title 5, the Administrator of the Transportation Security Administration shall impose the fee under subsection (a)(1) through the publication of notice of such fee in the Federal Register and begin collection of the fee as soon as possible.

**(2) Special rules passenger fees.**--A fee imposed under subsection (a)(1) through the procedures under paragraph (1) of this subsection shall apply only to tickets sold after the date on which such fee is imposed. If a fee imposed under subsection (a)(1) through the procedures under paragraph (1) of this subsection on transportation of a passenger of a carrier described in subsection (a)(1) is not collected from the passenger, the amount of the fee shall be paid by the carrier.

**(3) Subsequent modification of fee.**--After imposing a fee in accordance with paragraph (1), the Administrator of the Transportation Security Administration may modify, from time to time through publication of notice in the Federal Register, the imposition or collection of such fee, or both.

**(4) Limitation on collection.**--No fee may be collected under this section, other than subsection (i), except to the extent that the expenditure of the fee to pay the costs of activities and services for which the fee is imposed is provided for in advance in an appropriations Act or in section 44923.

**(e) Administration of fees.--**

**(1) Fees payable to Administrator.**--All fees imposed and amounts collected under this section are payable to the Administrator of the Transportation Security Administration.

**(2) Fees collected by air carrier.**--A fee imposed under subsection (a)(1) shall be collected by the air carrier or foreign air carrier that sells a ticket for transportation described in subsection (a)(1).

**(3) Due date for remittance.**--A fee collected under this section shall be remitted on the last day of each calendar month by the carrier collecting the fee. The amount to be remitted shall be for the calendar month preceding the calendar month in which the remittance is made.

**(4) Information.**--The Administrator of the Transportation Security Administration may require the provision of such information as the Administrator of the Transportation Security Administration decides is necessary to verify that fees have been collected and remitted at the proper times and in the proper amounts.

**(5) Fee not subject to tax.**--For purposes of section 4261 of the Internal Revenue Code of 1986 (26 U.S.C. 4261), a fee imposed under this section shall not be considered to be part of the amount paid for taxable transportation.

**(6) Cost of collecting fee.**--No portion of the fee collected under this section may be retained by the air carrier or foreign air carrier for the costs of collecting, handling, or remitting the fee except for interest accruing to the carrier after collection and before remittance.

**(f) Receipts credited as offsetting collections.**--Notwithstanding section 3302 of title 31, any fee collected under this section--

Addendum Page 3

**(1)** shall be credited as offsetting collections to the account that finances the activities and services for which the fee is imposed;

**(2)** shall be available for expenditure only to pay the costs of activities and services for which the fee is imposed; and

**(3)** shall remain available until expended.

**(g) Refunds.**--The Administrator of the Transportation Security Administration may refund any fee paid by mistake or any amount paid in excess of that required.

**(h) Exemptions.**--The Administrator of the Transportation Security Administration may exempt from the passenger fee imposed under subsection (a)(1) any passenger enplaning at an airport in the United States that does not receive screening services under section 44901 for that segment of the trip for which the passenger does not receive screening.

**(i) Deposit of receipts in general fund.**--

**(1) In general.**--Beginning in fiscal year 2014, out of fees received in a fiscal year under subsection (a)(1), after amounts are made available in the fiscal year under section 44923(h), the next funds derived from such fees in the fiscal year, in the amount specified for the fiscal year in paragraph (4), shall be credited as offsetting receipts and deposited in the general fund of the Treasury.

**(2) Fee levels.**--The Secretary of Homeland Security shall impose the fee authorized by subsection (a)(1) so as to collect in a fiscal year at least the amount specified in paragraph (4) for the fiscal year for making deposits under paragraph (1).

**(3) Relationship to other provisions.**--Subsections (b) and (f) shall not apply to amounts to be used for making deposits under this subsection.

**(4) Fiscal year amounts.**--For purposes of paragraphs (1) and (2), the fiscal year amounts are as follows:

**(A)** $1,320,000,000 for fiscal year 2018.

**(B)** $1,360,000,000 for fiscal year 2019.

**(C)** $1,400,000,000 for fiscal year 2020.

**(D)** $1,440,000,000 for fiscal year 2021.

**(E)** $1,480,000,000 for fiscal year 2022.

**(F)** $1,520,000,000 for fiscal year 2023.

**(G)** $760,000,000 for fiscal year 2024.

**(H)** $1,600,000,000 for fiscal year 2025.

[**(I)** Redesignated (E)]

[**(J)** Redesignated (F)]

[**(K)** Redesignated (G)]

[**(L)** Redesignated (H)]

**(M)** $1,640,000,000 for fiscal year 2026.

**(N)** $1,680,000,000 for fiscal year 2027.

**49 C.F.R. § 1510.1.  Applicability and purpose.**

This part prescribes a uniform fee to be paid by passengers of direct air carriers and foreign air carriers in air transportation, foreign air transportation, and intrastate air transportation originating at airports in the United States.

**49 C.F.R. § 1510.3.  Definitions.**

In addition to the definitions in §§ 1500.3, 1503.103, and 1540.5 of this chapter, the following terms are used in this part:

Air carrier means a citizen of the United States who undertakes directly to engage in or provide air transportation.

Air transportation means continental interstate air transportation, continental intrastate air transportation, foreign air transportation, non-continental interstate air transportation, or non-continental intrastate air transportation.

Aircraft means a device that is used or intended to be used for flight in the air.

Airport means any landing area used regularly by aircraft for receiving or discharging passengers or cargo.

Continental interstate air transportation means the carriage by aircraft of persons for compensation or hire within the continental United States.

Continental intrastate air transportation means the carriage by aircraft of persons for compensation or hire wholly within the same state of the continental United States.

Continental United States means the District of Columbia and the States other than Alaska and Hawaii.

Co-terminal means an airport serving a multi-airport city or metropolitan area that has been approved by TSA to be used as the same point for purposes of determining application of the security service fee imposed under § 1510.5 of this part. Copies of the approved list are available on TSA's Web site at www.tsa.gov or by contacting tsa-fees@dhs.gov.

Direct air carrier and foreign air carrier means a selling carrier.

Foreign air carrier means any person other than a citizen of the United States who undertakes directly to engage in or provide air transportation.

Foreign air transportation means the carriage by aircraft of persons for compensation or hire between a place in the United States and any place outside of the United States.

Addendum Page 7

Frequent flyer award means a zero-fare award of air transportation that a domestic air carrier or foreign air carrier provides to a passenger in exchange for accumulated travel mileage credits in a customer loyalty program, whether or not the term frequent flyer is used in the definition of that program.

Non-continental interstate air transportation means the carriage by aircraft of persons for compensation or hire within the United States, but outside the continental United States.

Non-continental intrastate air transportation means the carriage by aircraft of persons for compensation or hire wholly within the same state, territory or possession of the United States, but outside the continental United States.

Nonrevenue passenger means a passenger receiving air transportation from an air carrier or foreign air carrier for which the air carrier or foreign air carrier does not receive remuneration.

One-way trip means continuous air transportation, during which a stopover does not occur; there may be multiple one-way trips on the same air travel itinerary.

Origin point means the location at which a trip on a complete air travel itinerary begins.

Principal means the aggregate amount of all passenger security services fees due to be remitted to the Transportation Security Administration by an air carrier as required by this part.

Round trip means a trip on an air travel itinerary that terminates or has a stopover at the origin point (or co-terminal).

Selling carrier means an air carrier or foreign air carrier that provides or offers to provide air transportation and has control over the operational functions performed in providing that air transportation.

Stopover means a break in travel of more than:

> (1) Four (4) hours for continental interstate air transportation or continental intrastate air transportation, and

> (2) Twelve (12) hours for non-continental interstate air transportation, non-continental intrastate air transportation, or foreign air transportation.

Terminates means the location at which a trip on a complete air travel itinerary ends.

**49 C.F.R. § 1510.5.  Imposition of security service fees.**

(a) Each direct air carrier and foreign air carrier described in § 1510.9(a) shall impose a security service fee of $5.60 per one-way trip for air transportation originating at an airport in the United States. Passengers may not be charged more than $5.60 per one-way trip or $11.20 per round trip.

(b) The security service fee must be imposed on passengers who obtained the ticket for air transportation with a frequent flyer award, but may not be imposed on any other nonrevenue passengers.

**49 C.F.R. § 1510.7.  Air transportation advertisements and solicitations.**

A direct air carrier and foreign air carrier must identify the security service fee imposed by this part as "September 11th Security Fee" in all its advertisements and solicitations for air transportation.

**49 C.F.R. § 1510.9.  Collection of security service fees.**

(a) The following direct air carriers and foreign air carriers must collect security service fees from passengers on—

(1) A scheduled passenger or public charter passenger operation with an aircraft having passenger seating configuration of more than 60 seats.

(2) A scheduled passenger or public charter passenger operation with an aircraft having a passenger seating configuration of less than 61 seats when passengers are enplaned from or deplaned into a sterile area.

(b) Direct air carriers and foreign air carriers must collect from each passenger, to the extent provided in § 1510.5, a security service fee on air transportation sold on or after 12:00 a.m. (Eastern Daylight Time) on July 21, 2014. The security service fee must be based on the air travel itinerary at the time the air transportation is sold. Any changes by the passenger to the itinerary are subject to additional collection or refund of the security service fee by the direct air carrier or foreign air carrier, as appropriate.

(c) Whether or not the security service fee is collected as required by this part, the direct air carrier or foreign air carrier selling the air transportation is solely liable to TSA for the fee and must remit the fee as required in § 1510.13.

(d) Direct air carriers and foreign air carriers may not collect security service fees not imposed by this part.

**49 C.F.R. § 1510.11.  Handling of security service fees.**

(a) Direct air carriers and foreign air carriers are responsible for the safekeeping of all security service fees from the time of collection to remittance.

(b) Security service fees collected by a direct air carrier or foreign air carrier are held in trust by that direct carrier for the beneficial interest of the United States in paying for the costs of providing civil aviation security services described in 49 U.S.C. 44940. The direct air carrier or foreign air carrier holds neither legal nor equitable interest in the security service fees except for the right to retain any accrued interest on the principal amounts collected pursuant to § 1510.13(b).

(c) Direct air carriers and foreign air carriers must account for security service fees separately, but the fees may be commingled with the carriers' other sources of revenue.

(d) Direct air carriers and foreign air carriers must disclose in their financial statements the existence and the amount of security service fee held in trust.

**49 C.F.R. § 1510.13.  Remittance of security service fees.**

(a) Each direct air carrier and foreign air carrier must remit all security service fees imposed each calendar month to TSA, as directed by the Administrator, by the last calendar day of the month following the imposition.

(b) Direct air carriers and foreign air carriers may retain any interest that accrues on the principal amounts collected between the date of collection and the date the fee is remitted to TSA in accordance with paragraph (a) of this section.

(c) Direct air carriers and foreign air carriers are prohibited from retaining any portion of the principal to offset the costs of collecting, handling, or remitting the passenger security service fees.

(d) Security service fees are payable to the "Transportation Security Administration" in U.S. currency and drawn on a U.S. bank.

**49 C.F.R. § 1510.15.  Accounting and auditing requirements.**

(a) Direct air carriers and foreign air carriers must establish and maintain an accounting system to account for the security service fees imposed, collected, refunded and remitted. The accounting records must identify the airports at which the passengers were enplaned.

(b) Each direct air carrier and foreign air carrier that collects security services fees from more than 50,000 passengers annually must provide for an audit at least annually of its security service fee activities or accounts.

(c) Audits pursuant to paragraph (b) of this section must be performed by an independent certified public accountant and may be of limited scope. The accountant must express an opinion on the fairness and reasonableness of the direct air carrier's and foreign air carrier's procedures for collecting, holding, and remitting the fees. The opinion must also address whether the quarterly reports required in § 1510.17 fairly represent the net transactions in the security service fee accounts.

**49 C.F.R. § 1510.17.  Reporting requirements.**

(a) Each direct air carrier and foreign air carrier collecting security service fees must provide TSA with quarterly reports that provide an accounting of fees imposed, collected, refunded and remitted.

(b) Quarterly reports must state:

(1) The direct air carrier or foreign air carrier involved;

(2) The total amount of September 11th Security Fees imposed on passengers in U.S. currency for each month during the previous quarter of the calendar year;

(3) The net amount of September 11th Security Fees collected in U.S. currency by the direct air carrier or foreign air carrier for each month during the previous quarter of the calendar year;

(4) The total amount of September 11th Security Fees refunded in U.S. currency by the direct air carrier or foreign air carrier for each month during the previous quarter of the calendar year; and

(5) The total amount of September 11th Security Fees remitted in U.S. currency by the direct air carrier or foreign air carrier for each month during the previous quarter of the calendar year.

(c) The report must be filed by the last day of the calendar month following the quarter of the calendar year in which the fees were imposed.

**49 C.F.R. § 1510.19.  Federal oversight.**

Direct air carriers and foreign air carriers must allow any authorized representative of the Administrator, the Secretary of Transportation, the Secretary of Homeland Security, the Inspector General of the Department of Transportation, the Inspector General of the Department of Homeland Security, or the Comptroller General of the United States to audit or review any of its books and records and provide any other information necessary to verify that the security service fees were properly collected and remitted consistent with this part.

**49 C.F.R. § 1510.21.  Enforcement.**

A direct air carrier's or foreign air carrier's failure to comply with the requirements 49 U.S.C. 44940 or the provisions of this part may be considered to be an unfair and deceptive practice in violation of 49 U.S.C. 41712 and may also result in a claim due the United States by the carrier collectible pursuant to 49 CFR part 89. These remedies are in addition to any others remedies provided by law.