**No. 25-10461**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

————————————

SPIRIT AIRLINES, LLC,

Petitioner,

v.

TRANSPORTATION SECURITY ADMINISTRATION,

Respondent.

————————————

On Petition for Review of the Transportation Security Administration

————————————

**BRIEF FOR RESPONDENT**

————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

DANIEL TENNY
WEILI J. SHAW
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7240*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1371*

*Spirit Airlines, LLC v. Transportation Security Administration*, No. 25-10461

## AMENDED CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for respondent

Transportation Security Administration identifies the following individuals and

entities as having an interest in the outcome of this appeal.

Feinberg, Adam P.

McMenamin, Pamela

Mehringer, Holly C.

Miller & Chevalier Chartered

Shaw, Weili J.

Spirit Airlines, LLC (formerly Spirit Airlines, Inc.)

* Spirit Aviation Holdings, Inc. (ticker: FLYY)

* Tenny, Daniel

Transportation Security Administration

s/ Weili J. Shaw
WEILI J. SHAW
*Attorney, Appellate Staff*
*Civil Division, Room 7240*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1371*

* Additions to previous certificate are marked with an asterisk.

C-1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

Respondent believes that oral argument may be helpful to address any questions the Court may have regarding the statutory and regulatory scheme at issue in this case.

## TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION.............................................................................. 1

STATEMENT OF THE ISSUE.................................................................................. 1

STATEMENT OF THE CASE................................................................................... 2

      A.     Statutory and Regulatory Background ...................................................2

      B.     Prior Proceedings .................................................................................6

SUMMARY OF ARGUMENT ................................................................................. 9

STANDARD OF REVIEW ..................................................................................... 12

ARGUMENT ........................................................................................................... 13

     SPIRIT CANNOT RETAIN FEES COLLECTED FROM
     PASSENGERS ON BEHALF OF THE UNITED STATES ....................... 13

      A.     The statute does not allow airlines to retain collected fees.................13

      B.     TSA regulations reinforce that airlines cannot retain collected
            fees.........................................................................................................19

      C.     Spirit's contrary arguments are without merit ...................................24

      D.     Spirit cannot retain fees by putting them back into its own
            pocket when a credit expires ...............................................................32

      E.     Spirit cannot retain fees under the guise of applying them
            towards a cancellation fee ...................................................................37

      F.     The fair-notice doctrine does not allow Spirit to retain fees after
            a credit expires.....................................................................................41

CONCLUSION ........................................................................................................ 48

CERTIFICATE OF COMPLIANCE

ii

## TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

*Aerial Banners, Inc. v. FAA*,
   547 F.3d 1257 (11th Cir. 2008) ................................................................. 12, 13

*Alaska Airlines, Inc. v. Transportation Sec. Admin.*,
   588 F.3d 1116 (D.C. Cir. 2009) ................................................................. 25, 44

*Bank of Am., Nat. Tr. & Sav. Ass'n v. Anglim*,
   138 F.2d 7 (9th Cir. 1943) ................................................................................ 23

*Bombardier Aerospace Corp. v. United States*,
   831 F.3d 268 (5th Cir. 2016) .......................................................................... 23

*Bond v. United States*,
   572 U.S. 844 (2014) ........................................................................................ 21

*Cary v. Curtis*,
   44 U.S. 236 (1845) ................................................................................... 17, 18

*Caver v. Central Ala. Elec. Coop.*,
   845 F.3d 1135 (11th Cir. 2017) ..................................................................... 35

*Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm'n*,
   528 F.2d 645 (5th Cir. 1976)...........................................................................41

*Diebold, Inc. v. Marshall*,
   585 F.2d 1327 (6th Cir. 1978) ....................................................................... 41

*Dolan v. U.S. Postal Serv.*,
   546 U.S. 481 (2006) ................................................................................. 25, 34

*DuPont Glore Forgan Inc. v. American Tel. & Tel. Co.*,
   428 F. Supp. 1297 (S.D.N.Y. 1977), *aff'd sub nom.*,
   *American Tel. & Tel. Co. v. United States*,
   578 F.2d 1366 (2d Cir. 1978) ........................................................................ 22

*8x8, Inc. v. United States*,
   854 F.3d 1376 (Fed. Cir. 2017) ................................................................. 22-23

*Eighth St. Baptist Church, Inc. v. United States*,
   431 F.2d 1193 (10th Cir. 1970) ..................................................................... 16

iii

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ............................................................................... 36

*Kaucky v. Southwest Airlines Co.*,
   109 F.3d 349 (7th Cir. 1997) ................................................................ 29

*Lowman v. FAA*,
   83 F.4th 1345 (11th Cir. 2023) ............................................................ 38

*McGowan v. United States*,
   296 F.2d 252 (5th Cir. 1961) ................................................................ 23

*Royce v. Squire*,
   168 F.2d 250 (9th Cir. 1948) ........................................................ 23, 28

*Sharp & Dohme, Inc. v. United States*,
   144 F.2d 456 (3d Cir. 1944) .................................................................. 23

*Sigmon v. Southwest Airlines Co.*,
   110 F.3d 1200 (5th Cir. 1997) .............................................................. 17

*Slodov v. United States*,
   436 U.S. 238 (1978) ............................................................................... 17

*Southwest Airlines Co. v. United States*,
   777 F. Supp. 3d 1318 (Ct. Int'l Trade 2025) ................................. 27, 28

*United Airlines, Inc. v. United States*,
   111 F.3d 551 (7th Cir. 1997) .......................................................... 40, 41

*United States v. Jefferson Elec. Mfg. Co.*,
   291 U.S. 386 (1934) .......................................................................... 23-24

*United States v. Osmakac*,
   868 F.3d 937 (11th Cir. 2017) .............................................................. 45

*Vidiksis v. EPA*,
   612 F.3d 1150 (11th Cir. 2010) ............................................................ 38

**Statutes:**

Aviation and Transportation Security Act,
   Pub. L. No. 107-71, § 118(a), 115 Stat. 597, 625 (2001) ..................... 2
      49 U.S.C. § 44940 ............................................................................ 7

49 U.S.C. § 44940(a) ............................................................................ 25

49 U.S.C. § 44940(a)(1) ................................................................... 2, 14

49 U.S.C. § 44940(b) ............................................................................ 2

49 U.S.C. § 44940(c)(1) ........................................................................ 2

49 U.S.C. § 44940(d)(1) ................................................................... 3, 19

49 U.S.C. § 44940(d)(2) ...................................................................... 14

49 U.S.C. § 44940(d)(3) ................................................................... 3, 19

49 U.S.C. § 44940(e)(1) ............................................................. 3, 14, 27

49 U.S.C. § 44940(e)(2) ............................................................. 2, 14, 30

49 U.S.C. § 44940(e)(2)-(3) ............................................................... 26

49 U.S.C. § 44940(e)(3) ................................................................... 3, 14

49 U.S.C. § 44940(e)(4) ............................................................. 6, 18, 39

49 U.S.C. § 44940(e)(6) ............................................................. 3, 15, 18

49 U.S.C. § 44940(g) ...................................................... 2, 15, 16, 24, 27

19 U.S.C. § 58c(a)(5)(A) ..................................................................... 27

19 U.S.C. § 58c(g)(1) ......................................................................... 27

19 U.S.C. § 58c(g)(2) ......................................................................... 27

26 U.S.C. § 4261 ................................................................................ 21

26 U.S.C. § 6415(a) ........................................................................... 21

49 U.S.C. § 46110 ............................................................................... 1

49 U.S.C. § 46110(a) ........................................................................... 1

49 U.S.C. § 46110(c) ......................................................................... 13

**Regulations:**

7 C.F.R. § 354.3(e)(1) ........................................................................ 14

49 C.F.R. pt. 1510 ............................................................................... 7

49 C.F.R. § 1510.1 *et seq.* ................................................................... 3

49 C.F.R. § 1510.7 ............................................................................... 2

49 C.F.R. § 1510.9 ............................................................................. 30

49 C.F.R. § 1510.9(b) ......................................................... 4, 5, 8, 20, 31

49 C.F.R. § 1510.11(a) ........................................................... 3, 19, 35, 39

49 C.F.R. § 1510.11(a)-(b) ........................................................... 40
49 C.F.R. § 1510.11(b) .................................................. 3-4, 8, 19, 42
49 C.F.R. § 1510.11(c) ..................................................... 4, 19, 36, 39
49 C.F.R. § 1510.11(d) ............................................................ 4, 19
49 C.F.R. § 1510.13(c) .................................................................. 4
49 C.F.R. § 1510.19 ...................................................................... 6

## Other Authorities:

*Refund*:
Black's Law Dictionary (12th ed. 2024) ...........................................34
Oxford English Dictionary, https://doi.org/10.1093/OED/
9775532806 (last visited Sept. 2, 2025).......................................... 33-34

Rev. Rul. 89-109, 1989-2 C.B. 232 ...................................................5

Spirit Airlines, *Contract of Carriage* (June 24, 2005),
https://perma.cc/648S-E8NB .......................................................34

TSA, U.S. DHS/TSA - Response to the Air Transport Association's
Letter dated October 9, 2002 re: Application of 9/11 Security Fees
(Nov. 22, 2002), https://perma.cc/R5FC-YBM8 ................................44

**STATEMENT OF JURISDICTION**

On December 16, 2024, the Transportation Security Administration (TSA) issued a final decision upholding the agency's finding that petitioner Spirit Airlines, LLC (Spirit), formerly known as Spirit Airlines, Inc., should have remitted funds to TSA.  AR190, AR201.[1]  On February 12, 2025, Spirit timely filed a petition for review in this Court.  *See* 49 U.S.C. § 46110(a).  This Court has jurisdiction over the petition under 49 U.S.C. § 46110.[2]

**STATEMENT OF THE ISSUE**

Congress requires TSA to impose a security service fee on passengers of commercial air transportation originating in the United States.  Although passengers pay the fee, Congress requires air carriers to serve as collection agents by collecting and remitting the fee to TSA.  When some Spirit passengers canceled their tickets, Spirit gave those passengers expiring travel credits that included the collected fee amounts.  If a passenger did not use the credit within 60 days, Spirit claimed the fee for itself and booked it as revenue, neither refunding the fee to the passenger nor remitting it to TSA.

---

[1] Citations to the administrative record take the form AR__.  All cited record documents are reproduced in petitioner's appendix, which retains the page numbering from the administrative record in the bottom right corner.

[2] Spirit and various related entities filed Chapter 11 bankruptcy petitions at the end of August 2025.  *See In re Spirit Aviation Holdings, Inc.*, No. 25-11897 (Bankr. S.D.N.Y. filed Aug. 29, 2025).

The issue presented is whether Spirit was entitled to retain the collected security service fees as revenue rather than refunding them to the passengers or remitting them to TSA.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

As part of the Aviation and Transportation Security Act, Pub. L. No. 107-71, § 118(a), 115 Stat. 597, 625 (2001) (Act), Congress directed TSA to impose a security service fee, known as the September 11th Security Fee (security fee), 49 C.F.R. § 1510.7, "to pay for the . . . costs of providing civil aviation security services," 49 U.S.C. § 44940(a)(1).  The Act requires TSA to impose the fee "on passengers of air carriers and foreign air carriers in air transportation and intrastate air transportation originating at airports in the United States." *Id.*  The fee amount must be "reasonably related" to TSA's cost of providing security services.  *Id.* § 44940(b).  The fee is currently $5.60 per one-way trip and no more than $11.20 per round trip.  *Id.* § 44940(c)(1).  The Act further provides that, if a passenger pays more than the passenger ultimately owes, TSA "may refund any fee paid by mistake or any amount paid in excess of that required."  *Id.* § 44940(g).

Although passengers pay the fee, the Act specifies that the fee "shall be collected by the air carrier or foreign air carrier that sells a ticket for transportation."  49 U.S.C. § 44940(e)(2).  The Act further specifies the air

2

carrier's duties after collecting the fee.  The Act mandates that "[a]ll fees imposed and amounts collected under this section are payable to the Administrator of the Transportation Security Administration," *id.* § 44940(e)(1), and specifies when such payment must be made:  "[a] fee collected under this section shall be remitted on the last day of each calendar month by the carrier collecting the fee," *id.* § 44940(e)(3).  Finally, the Act provides that "[n]o portion of the fee collected under this section may be retained by the air carrier or foreign air carrier for the costs of collecting, handling, or remitting the fee except for interest accruing to the carrier after collection and before remittance."  *Id.* § 44940(e)(6).

The Act directs TSA to impose the fee through notice in the Federal Register, 49 U.S.C. § 44940(d)(1), and expressly provides that TSA "may modify, from time to time through publication of notice in the Federal Register, the imposition or collection of such fee, or both," *id.* § 44940(d)(3).

As directed, TSA has imposed the fee by regulation.  *See* 49 C.F.R. § 1510.1 *et seq.*  TSA's regulations further clarify air carriers' duties with respect to the security fee.  Air carriers "are responsible for the safekeeping of all security service fees from the time of collection to remittance."  *Id.* § 1510.11(a).  The fees collected "are held in trust by that direct carrier for the beneficial interest of the United States," and the air carrier has "neither legal nor equitable interest in the security service fees except for the right to retain any accrued interest."  *Id.*

3

§ 1510.11(b). Airlines "must account for security service fees separately" and "must disclose in their financial statements . . . the amount of security service fee held in trust." *Id.* § 1510.11(c), (d). Further, "air carriers are prohibited from retaining any portion of the principal to offset the costs of collecting, handling, or remitting the passenger security service fees." *Id.* § 1510.13(c).

Regarding refunds, TSA regulations provide that the fee collected "must be based on the air travel itinerary at the time the air transportation is sold" and that "[a]ny changes by the passenger to the itinerary are subject to additional collection or refund of the security service fee by the direct air carrier or foreign air carrier, as appropriate." 49 C.F.R. § 1510.9(b).

In 2002, the Air Transport Association, an airline trade association, asked for guidance regarding the treatment of the fee when passengers do not travel on their scheduled flights. AR1. The association asked: "[i]f [the] passenger's ticket expires, . . . is the previously collected . . . Passenger Security Service Fee . . . refundable to the passenger? If so, from whom does the passenger request the refund, since in many cases the airline has already remitted the funds collected . . . ?" AR2. The letter specifically noted that, in considering a similar transportation tax, the Internal Revenue Service had held that "to the extent the airline does not refund to the passenger the amount paid for the air transportation,

4

the collected transportation tax attributable to such nonrefunded amount is to be remitted to the Government."  AR2 (quoting Rev. Rul. 89-109, 1989-2 C.B. 232).

TSA responded that "[w]hen a ticket purchaser does not use a ticket for air transportation and the ticket then expires or loses its value," the security fee "is subject to a refund by the collecting carrier to the ticket purchaser," and "the carrier must provide the requester with a full refund of the fee" when requested. AR3 (citing 49 C.F.R. § 1510.9(b)).  "In any case where an air carrier does not refund September 11th Security Fees to the ticket purchaser, the fees must be remitted to or remain with TSA."  AR4.  As for the source of the refund, the letter stated that when a carrier refunds the fee to the purchaser, "the carrier may offset the refund by deducting it from" remittances to TSA for the month the refund is provided.  AR4.

On March 20, 2020, in response to inquiries during the COVID-19 pandemic, TSA again provided guidance on refunds of the fee.  TSA explained that "[w]hen requested by a passenger, TSA considers a passenger fee refund a return of payment preferably in the form of original payment."  AR5.  "Retaining any portion of the fee or providing credit towards future services, with or without an expiration, does not constitute a refund."  AR5.  Finally, "[i]f an air carrier does not refund the Passenger Fee to the passenger, the fee shall be remitted or remain with TSA."  AR5 (emphasis omitted).

5

### B.    Prior Proceedings

1.    This case stems from an audit, authorized by statute and regulation, 49 U.S.C. § 44940(e)(4), 49 C.F.R. § 1510.19, of Spirit's collection and remittance of the fee.  The audit covered the period from December 1, 2016, to December 31, 2018.  AR8.

The audit concluded that Spirit had failed to properly remit collected fees to TSA in certain cases where passengers canceled their tickets.  AR18.  Spirit issued these passengers expiring travel credits, called "credit shells," that the passengers could use only within 60 days.  AR16 & n.3.  The credits were in the amounts of the relevant airfare, taxes, and fees paid by the passengers, minus a cancellation fee if applicable.  AR18.  Spirit then deducted the security-fee amounts from its future security-fee remittances to TSA, AR17, thereby "recall[ing]" fees remitted to TSA, AR112.  When the travel credits were not used during the 60-day period, Spirit took the security-fee amounts from the credits and transferred them to its own revenue accounts.  AR17.  Spirit did not remit the fees to TSA.  AR17.  The security fees therefore ended up in the possession of Spirit, not the passengers who paid them or TSA.  AR17, AR19.

The audit concluded that Spirit improperly retained security fees as revenue when Spirit reclaimed those fees after credits expired unused, AR44, and that Spirit failed to remit $2,838,849.11 in security fees in such cases, AR20.  TSA

6

accepted the audit as evidence that Spirit failed to remit the fees as required. AR46.

2. Spirit requested TSA administrative review of the determination. AR50. Spirit argued that TSA could not collect fees for passengers who did not actually travel and that, even if Spirit was required to refund such a fee to the passenger, either the expiring travel credit or application of the credit to Spirit's cancellation fee constituted a refund. AR51. Spirit also claimed that it was unaware of TSA's 2002 guidance stating that security fees for canceled tickets must be refunded to the passengers or remitted to TSA. AR55.

TSA issued a final decision affirming its determination. AR190, AR201. TSA explained that "[t]he Fee statute (49 U.S.C. § 44940) and its implementing regulations (49 C.F.R. [pt.] 1510) make clear that carriers are allowed to only possess collected Fee amounts temporarily and that these collections must be remitted to TSA (if not refunded to the passenger)." AR191. In other words, "an air carrier that has collected a Fee for canceled air transportation can refund that Fee back to the passenger and claim a credit for doing so, but only if the Fee was remitted to TSA; the air carrier may not retain that Fee." AR191 (footnote omitted). Because Spirit ultimately retained the fee rather than returning it to the passenger that paid it, Spirit had to remit the fee to TSA. AR191.

TSA rejected Spirit's argument that "no Fee exists at all if a passenger does not ultimately fly" and therefore that Spirit need not remit the fee to TSA. AR195. TSA explained that, under § 44940(e), airlines' obligation to remit fees once collected does not depend on whether travel occurs. AR196. TSA further observed that 49 C.F.R. § 1510.9(b), which requires air carriers to make "additional collection or refund of the" fee based on itinerary changes, reinforces that airlines have no right to keep the security fee as revenue for themselves if a passenger does not travel. AR196-97 (emphasis and quotation marks omitted). TSA also explained that 49 C.F.R. § 1510.11(b) bars an air carrier from asserting any equitable or legal interest in the collected fee and therefore precludes it from keeping the fee for itself. AR198.

Finally, TSA concluded that a purported refund that results in the airline retaining the fee is not actually a refund of the security fee to the passenger. AR199-200. TSA explained that "[w]hile TSA has offered an accommodation for air carriers to offset any amounts that the air carrier has refunded to passengers from the total amount of Fees collected in any given month, Spirit's approach to expiring credit shells essentially creates a windfall for the airline": Spirit "both availed itself of that accommodation (by immediately 'recalling' from TSA the Fee amounts associated with a credit shell . . . ) and then withheld that same amount from the passenger." AR199-200. TSA found that "[t]his expiring credit

8

arrangement is not a refund of the Fee to the passenger in any material sense." AR200. "Spirit has not returned or repaid the Fee amount to the passenger, but rather devised an arrangement whereby it can lay claim to it . . . by offering only a temporary expiring credit towards future travel." AR200. TSA further concluded that Spirit had "fair warning" of the government's interpretation because the government's position "flow[ed] directly from the statutory text" and regulations, and "TSA's guidance in 2002, and again in 2020, is likewise clear that air carriers may not retain Fee amounts they collect from passengers." AR200. TSA explained that notice to the industry was "corroborated by the fact that air carriers with similar policies regarding non-refundable air transportation" did not retain security fees for themselves in similar circumstances. AR200 n.14.

3.    Spirit petitioned for review of TSA's final decision in this Court.

## SUMMARY OF ARGUMENT

1.    Congress established a tripartite structure for the security fee: passengers pay the fee, airlines collect the fee and remit it to TSA, and TSA uses the fee to defray the cost of providing security services. The statute further provides that TSA may refund the passenger if the passenger pays more than ultimately required. In this statutory scheme, airlines serve only as conduits for the fee between the passengers and TSA. Consistent with their role as collection agents, the statute never authorizes airlines to retain collected fees for themselves.

9

The statute's text and structure are sufficient to resolve this case, which concerns whether Spirit may retain as revenue security fees it collected on canceled tickets. Spirit argues that, because the passengers did not ultimately travel, those passengers did not owe the fee to TSA. But whether or not a passenger owed the fee is a separate question from whether Spirit can retain the collected fee for itself. The statute clearly specifies Spirit's statutory duty: Spirit must remit all collected fees to the United States and cannot keep fees for its own profit.

Nothing in TSA's decision prevents Spirit from refunding to its passengers any fees that Spirit believes were improperly collected or not owed. To the contrary, Spirit is encouraged to do so: as authorized by Congress, TSA has established a procedure for refunding passengers in which airlines perform their collection duties in reverse, effectively serving as refund agents. Airlines first refund the fee to the passenger, then deduct the fee from future remittances to TSA. That procedure never authorizes airlines to retain collected fees for themselves, as they are merely conduits for the transfer between TSA and the passenger. Spirit cannot "recall" passenger-paid fees from TSA and then retain those fees as revenue rather than return them to the passengers who paid them.

2. Spirit also argues that it is entitled to retain the fees because, upon cancellation of each ticket, Spirit gave each passenger an expiring travel credit

containing the amount of the fee.  The problem with that argument is that, upon expiration of the credits, Spirit reclaimed the funds from its passengers and put the fees back into its own pocket, booking them as revenue.  Neither the statute nor TSA's refund procedure allow Spirit to keep collected fees for itself, regardless of whether they were temporarily placed in a credit first.  By putting the fees back into its own coffers, Spirit effectively reversed any refunds it gave to the passengers.  And absent valid refunds, Spirit had no right to get the fees back from TSA.  Framed differently, Spirit effectively collected the fees a second time by taking them from its passengers' pockets and putting them in its own.  Spirit therefore cannot retain the collected fees as revenue but must refund them to the passengers or, if it does not, remit them to TSA.

3.     Spirit's argument that it provided passengers security-fee refunds but then used them to satisfy a cancellation fee is not properly before this Court because Spirit never raised it during the audit.  Spirit's failure to do so is particularly problematic because the theory that it used passengers' security-fee refunds to pay cancellation fees contradicts the theory it actually presented to auditors, which is that it included those security-fee refunds in the expiring travel credits it provided to passengers.  The auditors therefore never had a chance to test Spirit's new and inconsistent theory of what it did with the security fees.  Spirit's failure to separately account for the fees itself violates TSA's regulations.

11

Spirit's theory also fails because no law, regulation, or policy permits Spirit to condition a refund of a government fee on payment of a cancellation fee to Spirit. Moreover, the effect of the cancellation fee is simply that Spirit withholds part of the travel credit the passenger would otherwise receive. Withholding funds is not the same as providing a refund of the security fee; indeed, it is precisely the opposite.

4.    Spirit cannot evade its responsibility based on the fair-notice doctrine. That doctrine does not apply here because TSA does not seek to impose retrospective penalties on Spirit for violation of some standard of conduct; rather, TSA merely seeks to require Spirit to properly remit fees it collected on behalf of the United States and in which it has no property interest.

In any event, Spirit had more than fair notice of its obligations. The statute and regulations made clear that Spirit was never entitled to retain collected fees for itself. Moreover, TSA guidance from 2002 established that, in the context of a ticket that retains value but expires within a year, airlines were required to refund or remit the fees when the tickets expired. That guidance provided fair notice of how TSA would apply its rules in the analogous situation of an expiring credit.

## STANDARD OF REVIEW

This Court's review under 49 U.S.C. § 46110(c) is "deferential." *Aerial Banners, Inc. v. FAA*, 547 F.3d 1257, 1260 (11th Cir. 2008) (per curiam). The

12

Court "will uphold the agency's decision unless it is arbitrary and capricious, an abuse of discretion, or otherwise contrary to law." *Id.* The Court "will overturn the [agency]'s factual findings only if unsupported by substantial evidence in the administrative record." *Id.* (citing 49 U.S.C. § 46110(c)). [W]hen reviewing agency action under the [Administrative Procedure Act], we do not substitute our own judgment for the agency's about what action is warranted in the circumstances." *Id.*

## ARGUMENT

### SPIRIT CANNOT RETAIN FEES COLLECTED FROM PASSENGERS ON BEHALF OF THE UNITED STATES

### A.    The statute does not allow airlines to retain collected fees

The text of the security-fee statute is alone sufficient to resolve this case. That statute provides that airlines are responsible for collecting a security fee for TSA operations and remitting it to TSA. Under the statute, as TSA's decision explained, "air carriers may" never "retain Fee amounts they collect, even if the passenger does not ultimately" owe the fee. AR191. In that circumstance, under the TSA-established refund procedure discussed further below, *see infra* pp. 20-21, the airline can and should return any excess fee to the passenger. But if the airline does not do so, the statute requires it to remit that fee to TSA. The airline is not entitled to be rewarded for failing to refund its passenger by keeping the excess for itself.

1.    Congress, in directing TSA to establish the security fee, clearly specified the role of each party in the scheme.  The passenger is the payor of the fee, which the statute directs TSA to impose "on passengers of air carriers and foreign air carriers in air transportation . . . originating at airports in the United States."  49 U.S.C. § 44940(a)(1).[3]

TSA receives the fee and uses it to defray TSA's costs in providing security services.  *Id.*  "All fees imposed and amounts collected . . . are payable to the Administrator of the Transportation Security Administration."  *Id.* § 44940(e)(1).

Finally, airlines serve as collection agents for the fee.  The statute provides that the fee "shall be collected by the air carrier or foreign air carrier that sells a ticket for transportation."  49 U.S.C. § 44940(e)(2).  The statute also makes abundantly clear that airlines must remit all fees they collect to TSA.  In addition to providing that "[a]ll . . . amounts collected . . . are payable" to TSA, *id.* § 44940(e)(1), the statute states that all such fees "*shall* be remitted on the last day of each calendar month by the carrier collecting the fee," *id.* § 44940(e)(3) (emphasis added).

---

[3] The security fee therefore differs from other taxes and fees paid directly by the carrier.  *See, e.g.*, 7 C.F.R. § 354.3(e)(1).  Here, the airline is responsible for paying the security fee in only one limited circumstance not at issue here.  *See* 49 U.S.C. § 44940(d)(2).

Congress thus effectively required air carriers to serve as a conduit of funds from the passenger who pays the fee to TSA which receives it. Nothing in the statute permits the air carrier to retain any portion of the fee in any circumstance. That is clear enough from the provisions cited above, but Congress made it even more explicit: "[n]o portion of the fee collected under this section may be retained by the air carrier or foreign air carrier for the costs of collecting, handling, or remitting the fee except for interest accruing to the carrier after collection and before remittance." 49 U.S.C. § 44940(e)(6).

The statutory text therefore resolves this case. The issue here is whether Spirit can retain and book as revenue security fees it collected for TSA (and did not return to passengers under the TSA-established refund procedure discussed further below), or whether Spirit was instead required to remit those fees to TSA. The statute clearly provides that Spirit must remit all fees to TSA and cannot retain any fees for itself.

The statutory provisions requiring airlines to remit all collected fees contain no exception for cases in which the passenger overpaid—for example, because the passenger ultimately did not owe the fee to TSA or owed less than what was paid. The statute expressly contemplates that the amount originally paid by a passenger may be "in excess of" what is ultimately required. 49 U.S.C. § 44940(g). However, the only remedy the statute recognizes in that circumstance is that TSA

"may refund . . . any amount paid in excess of that required." *Id.* Because this refund provision applies to an amount "paid," and the fee is "paid" by the passenger, the statute authorizes TSA to provide a refund to the passenger that paid the fee. *See, e.g.*, *Eighth St. Baptist Church, Inc. v. United States*, 431 F.2d 1193, 1194 (10th Cir. 1970) (per curiam) ("Here, the Church is not the taxpayer; it is merely the collection agent for its taxpayer-employees. The withheld sums . . . are refundable to the taxpayer-employee, not to the withholding employer." (citation omitted)). The refund provision does not authorize an airline to keep a collected fee for itself on the ground that the passenger overpaid.

Nothing in the statute supports Spirit's contrary view that, if a passenger pays more than ultimately required, the proper result is that Spirit is entitled to keep the overpaid fee. As discussed above, Congress directed in mandatory terms that all collected fees are payable to TSA and that airlines must remit all fees to TSA, with no exception for overpaid fees. Congress also expressly provided that TSA "may refund any fee paid by mistake or any amount paid in excess of that required." 49 U.S.C. § 44940(g). Spirit may be correct that Congress anticipated, at least as a general matter, that airlines would have a hand in refunding passengers, and as discussed below TSA has created a mechanism for airlines to do just that. But to the extent Congress directly addressed the issue, its language— including the juxtaposition of the permissive "may" for refunds and the mandatory

16

"shall" for remitting funds to TSA—makes clear that fees that have not been refunded to passengers, for whatever reason, must be remitted to TSA and not retained as revenue by the collecting airline.

2.      That result is consistent not only with the statutory text but with the statute's structure and purpose.  Congress frequently requires third parties to serve as collection agents for fees and taxes.  *See, e.g.*, *Slodov v. United States*, 436 U.S. 238, 242-43 (1978) ("Several provisions of the Internal Revenue Code require third persons to collect taxes from the taxpayer.").  When Congress does so, its intention is clear:  collection agents are to faithfully collect the fees or taxes on the government's behalf and remit them, not profit from their role by holding on to their collections.  *See, e.g.*, *Cary v. Curtis*, 44 U.S. 236, 241 (1845) (interpreting statute to provide that, "under no circumstances . . . should the revenue be retained in the hands of the collector"; "he is announced to be the mere instrument or vehicle to convey the duties paid into his hands into the Treasury"); *Slodov*, 436 U.S. at 245 (explaining that, in the tax context, "an employer-official or other employee responsible for collecting and paying taxes who willfully fails to do so is subject to both a civil penalty equivalent to 100% of the taxes not collected or paid, and to a felony conviction"); *Sigmon v. Southwest Airlines Co.*, 110 F.3d 1200, 1203 (5th Cir. 1997) ("Southwest acts as the government's agent in collecting airline ticket excise taxes.").  That is true even if the tax turns out to be overpaid or

17

wrongfully collected. *See Cary*, 44 U.S. at 249 (explaining that tax collectors "have no discretion over money received by them, and . . . they shall never retain it to await the result of any contest concerning the right to it").

The same intention is evident here. Congress required airlines to remit all collected fees to TSA. *See supra* pp. 14-15. Congress also expressly barred airlines from retaining any portion of the fee to cover their costs, apart from interest. 49 U.S.C. § 44940(e)(6). Congress further sought to ensure that airlines would faithfully collect and remit the security fee by giving TSA the authority to "require the provision of such information as the Administrator of the Transportation Security Administration decides is necessary to verify that fees have been collected and remitted at the proper times and in the proper amounts." *Id.* § 44940(e)(4).

Allowing an airline to retain collected security fees would contravene the statutory structure established by Congress. If an airline collects fees on behalf of the United States and then puts them its own pocket, the airline obtains a windfall in the government's name that is inconsistent with faithful performance of its statutory responsibilities as a collection agent. Moreover, Spirit's reading would incentivize airlines to make it difficult for passengers to obtain refunds of their overpaid fees, as airlines could pocket any fees not refunded—just as Spirit attempted to do here. Properly construed, the statute does not create that perverse

18

incentive:  because the statute bars an airline from retaining overpaid fees for itself, the airline has an incentive to refund its customers instead and earn their goodwill.

### B.    TSA regulations reinforce that airlines cannot retain collected fees

1.    TSA regulations further reinforce that airlines have no right to retain any collected security fees, regardless of whether they are overpaid.  Congress authorized TSA to promulgate regulations implementing the fee.  *See* 49 U.S.C. § 44940(d)(1); *id.* § 44940(d)(3).  Pursuant to that authority, TSA issued regulations providing that air carriers "are responsible for the safekeeping of all security service fees from the time of collection to remittance."  49 C.F.R. § 1510.11(a).  In particular, collected fees "are held in trust by that direct carrier for the beneficial interest of the United States in paying for the costs of providing civil aviation security services described in 49 U.S.C. 44940."  *Id.* § 1510.11(b). The air carrier "holds neither legal nor equitable interest in the security service fees except for the right to retain any accrued interest on the principal amounts collected."  *Id.*  Air carriers "must account for security service fees separately," *id.* § 1510.11(c), and "must disclose in their financial statements the existence and the amount of security service fee held in trust," *id.* § 1510.11(d).  Retaining collected security fees and booking them as revenue violates every one of these provisions— doing so claims both legal and equitable interest in the funds, breaches the airline's trust duties, and fails to account for collected fees separately.

19

2.    TSA's regulations elaborate on the statute in one relevant respect by providing a specific procedure for refunding overpaid fees to passengers.  Initially, the fee amount to be collected is determined "based on the air travel itinerary at the time the air transportation is sold."  49 C.F.R. § 1510.9(b).  However, "[a]*ny* changes by the passenger to the itinerary are subject to additional collection or refund of the security service fee by the direct air carrier or foreign air carrier, as appropriate."  *Id.* (emphasis added).  Thus, if a passenger changes or cancels their itinerary such that the fee is no longer owed, or is owed in a lesser amount, the air carrier should refund to the passenger the appropriate portion of the fee, thereby accomplishing the refund authorized by Congress.

The regulations do not expressly provide that airlines may recover the refunded fees from TSA.  However, TSA authorized airlines to obtain corresponding refunds in its 2002 letter to industry, which stated that "[w]here a carrier remits a September 11th Security Fee to TSA and then refunds the fee to a ticket purchaser, the carrier may offset the refund by deducting it from the [fees] remitted to TSA for the month in which the refund is provided."  AR4 (emphasis omitted).  The letter makes clear, however, that "[i]n any case where an air carrier does not refund [the fees] to the ticket purchaser, the fees must be remitted to or remain with TSA."  AR4.

20

An airline's obligations regarding overpaid fees are therefore clear.  The air carrier should refund the fee to the passenger as a prerequisite to being able to deduct the refunded fee from future remittances to TSA.  As TSA's decision here explained, in every case, "the air carrier must either remit the collected Fee to TSA or return those amounts collected to the passenger; in no circumstance can the air carrier end up keeping the Fee as its own revenue."  AR197.  That result is consistent with the statute:  in refunding the fee, just as in collecting it, the airline serves as a conduit of funds and may never retain collected fees for itself.  *See supra* pp. 14-18.

3.    TSA's refund procedure is consistent with what Congress would have expected because it operates in the same way as many other fees and taxes with the same tripartite structure of payor, collection agent, and government recipient.  *Cf. Bond v. United States*, 572 U.S. 844, 857 (2014) ("Part of a fair reading of statutory text is recognizing that 'Congress legislates against the backdrop' of certain unexpressed presumptions.").  In these cases, the collection agent effectively performs its role in reverse, becoming a refund agent.  For example, several such schemes—including the airline transportation excise tax, 26 U.S.C. § 4261—are governed by 26 U.S.C. § 6415(a), which provides that "refund of any overpayment . . . may be allowed to the person who collected the tax and paid it to the Secretary"—that is, the collection agent—"if such person establishes . . . that

21

he has repaid the amount of such tax to the person from whom he collected it, or obtains the consent of such person to the allowance of such credit or refund."

The purpose of such a scheme is to establish an administrable refund process when a fee or tax is "imposed on a large number of taxpayers paying a relatively small amount of tax on each taxable transaction." *DuPont Glore Forgan Inc. v. American Tel. & Tel. Co.*, 428 F. Supp. 1297, 1304-05 (S.D.N.Y. 1977), *aff'd sub nom., American Tel. & Tel. Co. v. United States*, 578 F.2d 1366 (2d Cir. 1978). In such a case, the ultimate recipient of the fee or tax may, as here, have little information about who paid the fee, whether or not the fee was overpaid, and how to provide a refund to the payor if warranted. A procedure like the one TSA adopted here "eliminates the necessity of individual taxpayers filing refund claims for each overpayment . . . by allowing refunds to be made to the collecting agent for all of its customers." *Id.* at 1304. Such a procedure also "lessens the number of refund claims required by allowing a collecting agent in certain cases to take a credit upon a subsequent return instead of filing a refund claim." *Id.* at 1304-05. Crucially, the scheme "ensures that the ultimate economic benefit of any refund or credit is passed on to the taxpayer." *Id.* at 1305.

The essential feature of such a scheme is that the collection agent may not obtain a refund from the government unless it actually returns the fee or tax to the original payor. *See, e.g.*, *8x8, Inc. v. United States*, 854 F.3d 1376, 1383 (Fed. Cir.

22

2017) (denying refund to seller as collection agent where it "is seeking to recover costs borne by its customers, in direct contradiction of the Internal Revenue Code"); *Bank of Am., Nat. Tr. & Sav. Ass'n v. Anglim*, 138 F.2d 7, 8 (9th Cir. 1943).  In some contexts, a "Court-made amelioration" also permits a collection agent to recover the tax if it "had borne the economic burden of the tax" by paying out of pocket rather than collecting the tax from its customers, *McGowan v. United States*, 296 F.2d 252, 253 (5th Cir. 1961), but collection agents generally cannot obtain a refund unless they have refunded the original taxpayer, paid the tax themselves, or are acting on the taxpayer's behalf.  *See Sharp & Dohme, Inc. v. United States*, 144 F.2d 456, 458 (3d Cir. 1944); *Royce v. Squire*, 168 F.2d 250, 251 (9th Cir. 1948) (holding that collection agent "ha[s] no financial interest in the monies said to have been erroneously collected" where "[t]hey neither bore the burden of the tax, refunded the amounts collected, nor obtained authority to sue from those who did bear the burden").

Enforcing this requirement "prevents unjust enrichment" by preventing the collection agent from obtaining a refund of taxes paid by someone else. *Bombardier Aerospace Corp. v. United States*, 831 F.3d 268, 274 (5th Cir. 2016). The Supreme Court has likewise noted that "[t]his plainly is but another way of providing that the money shall go to the one who has been the actual sufferer and therefore is the real party in interest." *United States v. Jefferson Elec. Mfg. Co.*,

23

291 U.S. 386, 402 (1934).  For the same reasons, any refund here must ultimately go to the passenger and not Spirit.

### C.    Spirit's contrary arguments are without merit

1.    Spirit's contrary arguments largely miss the point.  Spirit focuses (at 19-33) on showing that passengers do not owe the fee to TSA if they do not travel.  But those arguments fail to address the actual issue of whether, even assuming a passenger no longer owes the fee, Spirit may pocket the fee as revenue.

That question is answered by the statute and TSA's statutorily-authorized refund procedure.  As discussed, the statute expressly contemplates that a passenger may pay a fee "in excess of" what is ultimately required and provides that TSA "may refund" the fee the passenger "paid."  49 U.S.C. § 44940(g).  TSA has done so by creating a procedure in which airlines return the fee to passengers and then obtain corresponding refunds from TSA.  *See supra* pp. 20-21.  The proper disposition of an overpaid fee is therefore straightforward.  The airline, which is otherwise required by statute to remit all collected fees to TSA, should refund the fee to the passenger and deduct the same amount from future remittances to TSA.

The dispute in this case only arises because Spirit "recalled" the fees from TSA but did not ultimately return the fees to the passengers who paid them.  The question therefore is not whether passengers owed fees on flights not flown, nor

24

whether those fees should be refunded to the passengers who paid them, but rather whether Spirit should be financially rewarded for failing to provide those refunds.

2.       Spirit's effort (at 19-23) to frame the case as hinging on the meaning of the term "passenger" in 49 U.S.C. § 44940(a) is misguided because the interpretation of that term does not bear on what the statute requires with respect to an overpaid fee; only § 44940(g) addresses that scenario.  Spirit's attempt to use that term to override the statutory text and structure discussed above is inconsistent with basic statutory interpretation principles.  *See, e.g.*, *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("The definition of words in isolation, however, is not necessarily controlling in statutory construction. . . .  Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute . . . .").

Spirit's argument also fails on its own terms.  Spirit contends (at 24) that "when customers cancel the ticket before they travel, they never become 'passengers'" subject to the statute's requirements.  But the term "passenger" can encompass individuals who purchase a ticket and intend to travel in the future as well as those who purchase a ticket but do not ultimately travel.  *See, e.g.*, *Alaska Airlines, Inc. v. Transportation Sec. Admin.*, 588 F.3d 1116, 1122 (D.C. Cir. 2009) (explaining that TSA's "refund policy authorized refunds to the air carrier where it

was obligated to refund the fee to *a passenger who never used the purchased ticket*" (emphasis added)).

Spirit's argument is ultimately self-defeating. Spirit contends (at 18) that, if it collects and remits a fee based on a purchased itinerary but the passenger does not ultimately travel, TSA is not entitled to retain the fee and Spirit can "recall" the fee from TSA. But if TSA cannot retain the fee, then neither can Spirit. Under the statute, collection and remittance of the fee are linked: the fee "shall be collected by the air carrier" and "[a] fee collected under this section shall be remitted . . . by the carrier collecting the fee." 49 U.S.C. § 44940(e)(2)-(3). If the fact that the passenger did not ultimately travel means that TSA lacked statutory authority to collect the remittance from Spirit, then Spirit also acted lacked statutory authority to collect the fee from the passenger. In that case, Spirit would have to return the fee to the passenger, not keep the fee as profit.

Under Spirit's interpretation, the only way to avoid *ultra vires* action would be to collect and remit the fee only once a passenger actually flies. But in practice, Spirit collects and remits fees when a ticket is sold, AR15, which is the reason the excess fees in this case exist in the first place. That practice reflects that Spirit has always understood the statute and TSA's regulations to require the collection and remittance of fees before travel occurs, based on a passenger's purchased itinerary.

26

3.    Spirit errs in relying (at 25-27) on the Court of International Trade's decision in *Southwest Airlines Co. v. United States*, 777 F. Supp. 3d 1318, 1330-31 (Ct. Int'l Trade 2025).  That decision addresses the customs service fee administered by Customs and Border Protection (CBP), 19 U.S.C. § 58c(a)(5)(A). Although the customs service fee has a similar structure to TSA's security fee, the relevant statutes and regulations use different operative language.  *See, e.g.*, *id.* § 58c(g)(1) (making no mention of refunds but providing that regulations regarding collection and remittance "shall be consistent with the regulations . . . for the collection and remittance of the" airline transportation excise tax); *id.* § 58c(g)(2) (providing that customs law and regulations will apply "as if [the customs service] fee is a customs duty").  The Court of International Trade did not grapple with the TSA security fee, which is governed by an entirely different statute.  *See, e.g.*, 49 U.S.C. § 44940(e)(1) (directing that "[a]ll fees imposed and amounts collected" be paid to TSA); *id.* § 44940(g) (authorizing TSA to refund fees paid by mistake or in excess).

More importantly, the court's analysis suffers from the same errors as Spirit's brief in that it answers the wrong question.  Like Spirit, the court failed to recognize that the question before the court was not whether a passenger owes the fee to CBP if the passenger ultimately does not travel, but rather whether airlines can retain collected fees for themselves on the ground that the passenger, due to a

27

change in travel plans, ultimately overpaid.  Spirit relies (at 26) on the courts'

reasoning that "[w]here a customer cancels their ticket, there is no arriving

passenger, CBP provides no customs services, and thus CBP is not entitled to a

fee." *Southwest Airlines*, 777 F. Supp. 3d at 1326.  But that would just mean that

the airline should refund the passenger through the established refund procedure,

not that the airline can keep the passenger's money for itself.

The Court of International Trade sought to evade this outcome by reasoning

that, when a passenger does not travel, the money paid loses its status as a "fee."

*Southwest Airlines*, 777 F. Supp. 3d at 1327.  Thus, the court believed, the fee

becomes an unrestricted sum of money that the air carrier can "recall" from the

government and retain for itself, subject only to any contractual obligations

between the air carrier and the passenger.  *Id.*

That reasoning is gravely flawed.  Courts have rejected the proposition that,

where a tax or fee is overpaid—or even unlawfully collected to begin with—the

amounts paid are no longer subject to procedural requirements governing those

taxes or fees.  For example, the Ninth Circuit has held that, even when a

transportation tax arguably did not apply because the transport provided was not

"within the reach of the taxing act," the transport company that collected the tax

was still required to comply with refund procedures that required it to refund

passengers before seeking a refund from the government.  *Royce*, 168 F.2d at 251.

In other words, even if the tax statute did not apply and no tax was owed, procedural requirements governing the refund of taxes collected under that statute still applied. *See also Kaucky v. Southwest Airlines Co.*, 109 F.3d 349, 351-52 (7th Cir. 1997) (holding that funds collected for anticipated tax never ultimately enacted by Congress were not "literal[ly]" a tax but that procedural requirements for refunds still applied). The whole point of a refund procedure is to properly allocate the money paid when a fee or tax is not owed.

The Court of International Trade's contrary interpretation would produce chaos, including in contexts beyond the one before it. On the court's reasoning, whenever a fee or tax is allegedly overpaid, those funds would lose their character as a "fee" or "tax," and any procedural requirements for their collection and remittance would no longer apply. As a result, the last private entity to hold the funds—such as a withholding agent like an employer, or a collection agent like a seller of goods or services—would receive a sudden windfall absent some contractual obligation to return those funds to the person who actually paid them. That result cannot be squared with the many cases holding that collection agents cannot obtain refunds of overpaid taxes if they do not refund the actual taxpayers and, as noted, would discourage collection agents from properly refunding their customers. *See supra* pp. 18-19, 21-24.

29

4.      Spirit takes issue (at 27-29) with the government's position that airlines must collect the fee at the time a ticket is sold, but the government's view is at least implicit in the statute and expressly stated in TSA regulations.  *See* 49 U.S.C. § 44940(e)(2) ("A fee imposed under subsection (a)(1) shall be collected by the air carrier or foreign air carrier that sells a ticket for transportation . . . ."); 49 C.F.R. § 1510.9 ("The security service fee must be based on the air travel itinerary at the time the air transportation is sold.").  Indeed, the Air Transport Association recognized in its 2002 letter that "[a]irlines are required to collect this fee . . . at the time a ticket is sold."  AR1-2.

Moreover, the question of when the fee was supposed to be collected distracts from the critical legal consideration here.  The issue in this case arose precisely because Spirit did collect fees at the time tickets were sold, but the passengers did not fly the purchased itineraries.  Spirit's argument amounts to the odd contention that it is entitled to keep money that it was not supposed to collect in the first place.  In any event, regardless of when the fee was collected, the question before this Court is whether an airline can retain the fee for itself on the ground that the passenger paid more than was ultimately due.  As discussed above, the statute contemplates overpayments and authorizes TSA to refund passengers in such cases but never permits airlines to retain the fee.

30

Spirit argues (at 32) that 49 C.F.R. § 1510.9(b), which provides that "[a]ny changes by the passenger to the itinerary are subject to additional collection or refund of the security service fee . . . as appropriate," does not apply to cancellations. That reading makes little sense; the regulation refers to "[a]ny changes," which can extend to cancellations, and there is no reason the regulation should require a refund if a passenger cancels three out of four segments of an itinerary, but not if the passenger cancels all four. Again, however, nothing turns on Spirit's reading of this provision. If the regulation does not obligate Spirit to refund the fee and Spirit does not do so voluntarily, Spirit has no basis for "recalling" the fee from TSA. As explained, TSA has authorized airlines to offset refunds against future remittances only if they actually refund the passenger. *See supra* pp. 20-21.

Spirit likewise errs in accusing the government (at 29) of relying on ancillary statutory provisions to undermine the core statutory purpose. To the contrary, the government's understanding of the statute aligns all of the relevant provisions in service of the same congressional purpose: Congress intended airlines to faithfully collect and remit the security fee without retaining fee amounts for themselves. To the extent overpayments occur, Congress gave TSA authority to refund those fees, which TSA has done by directing airlines to refund their passengers and authorizing them to offset such refunds against their future

31

remittances.  *See supra* pp. 20-21.  Again, nothing in that procedure authorizes airlines to retain collected fees for themselves.  *See id.*

For the same reason, Spirit's accusation (at 32-33) that TSA uses regulations to trump the statute has no merit.  As discussed above, the government's position follows from the statute itself, and the regulations and refund procedure merely reinforce the natural reading of the statutory text.

### D.     Spirit cannot retain fees by putting them back into its own pocket when a credit expires

Spirit next argues (at 34-38) that it is entitled to retain the fees at issue because Spirit gave many of the passengers at issue (but not all) an expiring travel credit that included the amount of the fee, thereby entitling it to "recall" the fees from TSA.  But this case does not present the question of whether such travel credits are properly treated as refunds if they are used by the passenger.  Instead, this case presents a much simpler question:  whether Spirit is entitled to place those fees back into its own pocket and book them as revenue when the credits expire unused.  Plainly, it is not.

1.     As discussed above, "collected Fees cannot ultimately reside with the air carrier," AR197; the statute requires the air carrier to remit all fees to TSA or, as authorized by TSA, refund them to the passenger and then claim a credit towards the carrier's future remittances.  Spirit cannot evade that scheme by

32

purporting to refund the fee in an expiring travel credit and then pocketing the fee when the credit expires.

Even assuming for purpose of argument that a travel credit is a valid refund to the passenger, taking the fee back from the passenger and booking it as revenue effectively reverses that refund. Thus, as TSA's decision explained, Spirit "must remit that un-refunded Fee to TSA." AR197. Framed differently, Spirit's actions were equivalent to collecting the fee from the passenger a second time: Spirit again took the money from the passenger's pocket and placed it in its own. In this circumstance, Spirit's statutory and regulatory obligations are the same as if it collected a fee and never refunded it: it again holds a collected security fee, and it must either remit the fee to TSA as required by statute or refund it to the passenger as authorized by TSA.

2.    The logic above easily defeats Spirit's contention (at 35-37) that, in some contexts, the term "refund" may encompass the provision of account credits. Even if the travel credit could initially be considered a refund, Spirit ultimately took the collected fee back and put it in its own pocket as revenue, thereby reversing any refund even if one occurred.

This Court therefore need not reach Spirit's arguments about the definition of "refund," which are wrong in any event. A refund is "[a] repayment; the return of money paid." *Refund*, Oxford English Dictionary,

33

https://doi.org/10.1093/OED/9775532806 (last visited Sept. 9, 2025); *see also Refund*, Black's Law Dictionary (12th ed. 2024) ("The return of money to a person who overpaid . . . ."). But Spirit has not truly "return[ed]" the fee to the passenger if Spirit retains the power to seize the fee back after 60 days, and it has certainly not done so if it actually exercises that power and puts the fee back in its own pocket. The expiring (and ultimately expired) travel credits here therefore were not refunds. Spirit's own usage in its current contract of carriage is consistent with this interpretation, distinguishing between a "refund" and a "travel credit" or "voucher": "If you are eligible for a refund, Spirit will disclose your refund eligibility when you are offered any alternative transportation, travel credit, voucher, or other compensation *in lieu of a refund*." *See* Spirit Airlines, *Contract of Carriage* 56 (June 24, 2005), https://perma.cc/648S-E8NB (emphasis added).[4] Similarly, "[g]uests involved in a Spirit Airlines cancellation or delay . . . will have three (3) options available to them: 1) a refund 2) re-accommodation, 3) a credit for future travel." *Id.* at 48; *see also id.* ("Refunds will only be issued to the form of payment used to complete the original purchase.").

Whether a credit constitutes a refund also depends on context. *See Dolan*, 546 U.S. at 486 ("A word in a statute may or may not extend to the outer limits of

---

[4] The cited document is Spirit's current contract of carriage, not the one that applied during the audit period.

its definitional possibilities."). It would be absurd to contend, for example, that the Internal Revenue Service provided a taxpayer a valid refund of income taxes if the taxpayer's sole option was to receive it as a credit good only for purchasing admission to national parks within 60 days. This case similarly concerns a government fee ultimately paid to and refunded by TSA, not Spirit. Spirit's argument amounts to the strange contention that, in refunding the passenger on TSA's behalf, Spirit can give itself the right to reclaim the refund after 60 days if unused. Spirit's examples (at 35-37) of refunds in the context of transactions solely between a merchant and its customers do not speak to this scenario, where the airline collects the fee on behalf of the government and can never retain the fee for itself. And most of Spirit's examples, including *Caver v. Central Alabama Electric Cooperative*, 845 F.3d 1135 (11th Cir. 2017), address credits in general, not expiring credits that the merchant can reclaim for itself after a short period.

Spirit's expiring credits are not proper refunds for the further reason that they violate TSA regulations. By placing the amount of the fee in a larger but undifferentiated credit that can be used for only one purpose and within 60 days, Spirit effectively loses the fee as a distinct sum even though Spirit retains an interest in the credit and knows that, in many cases, it will take the funds back in 60 days. Doing so contravenes Spirit's responsibility "for the safekeeping of *all* . . . fees from the time of collection to remittance," 49 C.F.R. § 1510.11(a)

35

(emphasis added), and its obligation to account for the fee separately at all times, *id.* § 1510.11(c).

3.      Spirit also errs in alleging (at 44-45) that TSA acted inconsistently by not seeking recovery of fees when the passenger actually used the credit to purchase a new ticket.[5]  As an initial matter, TSA's position in its March 2020 guidance is that "providing credit towards future services, with or without an expiration, does not constitute a refund."  AR5.  However, TSA did not seek to enforce that position against Spirit in the audit.  Instead, both CBP (in conducting the audit on TSA's behalf) and TSA (in affirming the audit findings), AR46, only sought recovery in cases where Spirit ultimately retained the fee.  *See* AR44 ("By retaining the fees collected on behalf of TSA and recognizing those fees as revenue, Spirit has created an equitable interest in the principal amounts.");  AR190-91.  TSA had discretion to seek recovery in only the most egregious cases. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

In any event, there is no inconsistency in seeking recovery in cases where Spirit claimed the fee as revenue on expiration but not in cases where the passenger used the travel credit to purchase travel.  In the latter case, the passenger has used the funds in question to purchase something of value.  Thus, although the

---

[5] In such cases, Spirit collected the appropriate security fee for the new itinerary from the travel credit and remitted it to TSA.  AR17.

funds ultimately return to Spirit, they do so through an economic exchange similar to those that make up Spirit's core business as an air carrier. If Spirit had refunded the fee in cash, and the customer had used that cash to buy another ticket from Spirit, there would be no argument that Spirit had somehow pocketed the fee. In contrast, when Spirit claims the fee for itself after expiration of a travel credit, no exchange of value occurs: Spirit simply puts the fee back into its own pocket. That transaction, which effectively reverses any arguable refund or recollects the fee, independently violates the statute and the refund scheme in a manner that does not occur when a passenger purchases future transportation.

### E.　Spirit cannot retain fees under the guise of applying them towards a cancellation fee

Spirit does not advance its argument by suggesting (at 38-39) that it is somehow more entitled to retain security fees for its own profit if it also charges passengers a cancellation fee. Under Spirit's policy, the airline gave passengers an expiring travel credit for the total amount paid for the ticket, including the security fee, but sometimes deducted a cancellation fee from that credit. At the time, Spirit imposed cancellation fees of up to $100, capped at the total amount paid for the ticket. AR111. Spirit argues (at 38) that, in some cases, it gave its passengers refunds of the security fee but then applied those refunds to the cancellation fee.

However, Spirit never raised this claim during the audit. *See* AR30-35 (Spirit response to preliminary audit findings); AR43-45 (auditor's rejoinder,

which revised audit finding on another issue based on further evidence provided by Spirit). Spirit only raised the cancellation-fee argument for the first time in seeking administrative review of the audit finding, AR50-51, at which point it was too late for the auditors to examine Spirit's books and test its new assertion regarding how it disposed of the security fee. *See* AR190 (concluding that expired-credit issue was only issue before TSA). Spirit's argument therefore is not properly before this Court. *See Lowman v. FAA*, 83 F.4th 1345, 1357 (11th Cir. 2023) ("[U]nder ordinary principles of administrative law, a reviewing court will not consider arguments that a party failed to raise in timely fashion before the administrative agency." (quoting *Vidiksis v. EPA*, 612 F.3d 1150, 1158 (11th Cir. 2010))).

Spirit's failure to raise the cancellation-fee theory during the audit is particularly problematic because that theory contradicts the position Spirit actually took during the audit and subsequently, which is that Spirit provided security-fee refunds to its passengers by issuing expiring travel credits that *included* the security fee. *See* AR32, AR61-63, Br. 34. Under the new cancellation-fee theory, in contrast, the purported security-fee refunds were entirely consumed by applying them to the cancellation fee; the expiring travel credits therefore contained no security-fee amounts. The agency's auditors had no opportunity to test whether this new and inconsistent theory was correct.

38

Spirit's contradictory explanations demonstrate why TSA regulations provide that airlines "must account for security service fees separately," 49 C.F.R. § 1510.11(c), and make airlines "responsible for the safekeeping of all security service fees from the time of collection to remittance," *id.* § 1510.11(a). Spirit's shifting accounts of what it did with the security fees are possible only because Spirit commingled security-fee funds and other funds in an undifferentiated, expiring travel credit and failed to track the security-fee funds separately. *See* AR199. That approach violates TSA regulations, AR199, and makes it impossible for TSA to perform its statutory duty to ensure that Spirit is properly handling collected fees, *see* 49 U.S.C. § 44940(e)(4), further confirming that TSA correctly found that Spirit did not properly refund the security fee to its passengers.

Spirit's theory is also wrong on the merits. Deducting $100 from an expiring travel credit the passenger would otherwise receive does not mean that Spirit has provided more of a refund; it means that Spirit has provided less.

There is also no basis in common sense for Spirit's theory that it satisfied the cancellation fee with security-fee funds first, and then the remainder from non-security-fee funds, as opposed to taking the cancellation fee fully from non-security-fee funds. Suppose the total paid apart from the security fee was $200, and the security fee was $5.60. Spirit would withhold the $100 cancellation fee, leaving an expiring travel credit of $105.60. That certainly has the look of the

39

passenger receiving a travel credit in the amount of the security fee; if the fee was $11.20 instead, the travel credit would be $111.20.

Moreover, airlines cannot allocate security fees in whatever manner they think most profitable. Airlines hold collected fees "in trust . . . for the beneficial interest of the United States" and are responsible for their safekeeping, 49 C.F.R. § 1510.11(a)-(b), so they cannot simply elect to withhold the cancellation fee from security-fee funds rather than from fare funds. Furthermore, a passenger's entitlement to a refund of the security fee arises not as a matter of contract with the carrier, but from federal law. Thus, although an airline may condition a refund of a passenger's airfare on deduction of a cancellation fee from that refund, it may not impose the same condition on a refund of the security fee. Nor did any passenger make a voluntary decision to pay a cancellation fee out of security-fee funds rather than fare funds. Spirit's theory that it used purported security-fee refunds to pay cancellation fees therefore violates the security-fee statute and regulations.

Spirit does not advance its argument by relying on *United Airlines, Inc. v. United States*, 111 F.3d 551 (7th Cir. 1997). In *United*, the Seventh Circuit accepted a jury's factual finding that a cash refund and the imposition of a cancellation fee could be treated as separate transactions, and thus that United could be credited with having fully refunded an excise tax even though it also deducted a cancellation fee of a percentage of the total paid. *Id.* at 552, 554.

40

However, in the scenarios the court considered, United always provided a cash refund sufficient to fully refund the tax; although the court's opinion noted that one small category of tickets had a 100% cancellation fee, the court never grappled with the implications of that scenario. *See id.* at 552. Whatever the persuasive value of the Seventh Circuit's acceptance of a jury verdict in the context of a cash refund of a different tax, it cannot possibly establish as a matter of law that this Court must accept Spirit's claim—which is contrary to its other arguments—that it used security-fee funds rather than the passenger's fare to satisfy the cancellation fee.

> **F.    The fair-notice doctrine does not allow Spirit to retain fees after a credit expires**

1.      Spirit cannot evade its obligations here on the ground that it lacked fair notice of the agency's interpretation. According to Spirit, the fair notice doctrine "prohibits punishment if the regulations do not 'give an adequate warning of what they command or forbid.'" Br. 40 (quoting *Diebold, Inc. v. Marshall*, 585 F.2d 1327, 1335 (6th Cir. 1978)). Spirit also argues that "[s]tatutes and regulations which allow monetary penalties against those who violate them . . . must give . . . fair warning of the conduct it prohibits or requires." Br. 39 (second and third alterations in original) (quoting *Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976)).

The fair-notice doctrine does not apply here because this case does not concern retrospective punishment for actions already taken, but rather the proper prospective disposition of funds in which Spirit has no property interest. *See* 49 C.F.R. § 1510.11(b) (air carrier "holds neither legal nor equitable interest in the security service fees except for the right to retain any accrued interest on the principal amounts collected"); *id.* (providing that collected fees "are held in trust by that direct carrier for the beneficial interest of the United States"). Congress did not impose a punishment on Spirit when it required Spirit to remit collected fees to TSA; rather, such a remittance represents only the performance of Spirit's statutory responsibility as collection agent. TSA's decision here likewise required Spirit to return to TSA fees that Spirit collected on TSA's behalf, as required by the statute, but the decision did not impose punishment on Spirit for any action or omission. If Spirit is not permitted to retain the fees, it merely loses the opportunity to retain money that does not belong to it.

2.   Even if the doctrine does apply, Spirit had far more than fair notice that it had no right to retain fees collected for TSA. As discussed, the statute and regulations never authorize Spirit to retain collected fees for itself, whether in collecting or refunding fees, and they make clear that Spirit has no interest in those fees. *See supra* pp. 14-17, 19. It was therefore plainly unreasonable for Spirit to expect to retain any collected fees as revenue. It was certainly unreasonable for

42

Spirit to conclude that it could keep collected fees as revenue through the contrivance of first placing the fee amounts into expiring travel credits, a percentage of which Spirit knew would go unused, and then transferring those funds into its own coffers upon expiration.

TSA guidance provided further notice of the agency's interpretation. As TSA's decision on review explained, the expiring credits Spirit provided are analogous to the expiring tickets that were the subject of TSA's 2002 guidance. AR197. That year, only months after the statute's enactment, the Air Transport Association asked TSA for guidance on expiring tickets. The Air Transport Association explained that, although some tickets lost their value immediately if not used on the scheduled travel date, others retained value for future travel for up to one year. AR1. Those expiring tickets were therefore analogous to the expiring credits here in that both allowed a passenger to retain for a limited period some of the value of the fare and security fee originally paid.

TSA's response to the Air Transport Association regarding expiring tickets was clear: "[w]hen . . . the ticket . . . expires or loses its value, the September 11th Security Fee involved is subject to a refund by the collecting carrier to the ticket purchaser." AR3. "In any case where an air carrier does not refund September 11th Security Fees to the ticket purchaser, the fees must be remitted to or remain with TSA." AR4. TSA's guidance therefore gave fair notice that, when an

43

analogous travel credit expires and loses its value, the security fee must be refunded to the passenger or else remitted to TSA.  TSA's 2002 guidance far predated the Spirit audit, which covered the period from December 2016 to December 2018.  AR8.

Spirit asserts (at 42) that it had no knowledge of the 2002 guidance, but that guidance was posted to the public rulemaking docket pertaining to the security fee. *See* TSA, U.S. DHS/TSA - Response to the Air Transport Association's Letter dated October 9, 2002 re: Application of 9/11 Security Fees (Related to Item #57) (Nov. 22, 2002), https://perma.cc/R5FC-YBM8 (rulemaking docket entry for guidance on Regulations.gov).  The D.C. Circuit cited that guidance as representing TSA's refund policy in 2009.  *See Alaska Airlines*, 588 F.3d at 1122. Moreover, as the D.C. Circuit's decision noted, the 2002 guidance "authorized refunds to the air carrier where it was obligated to refund the fee to a passenger who never used the purchased ticket." *Id.*  Spirit has repeatedly sought to rely on that authority by "recalling" fees from TSA after providing expiring travel credits to its passengers.  Spirit does not explain why it believed it could "recall" already-remitted fees from TSA if it was unaware of the 2002 guidance.

Spirit objects (at 45) that this guidance was more limited than TSA's March 2020 letter, which stated that "credit towards future services, with or without an expiration, does not constitute a refund."  AR5.  But as explained, TSA chose not

44

to enforce that more categorical interpretation against Spirit and instead sought to recover fees only where Spirit clearly placed fees in its own pocket upon expiration of a travel credit or provided no credit at all. *See supra* pp. 36-37. Nothing bars TSA from prioritizing recovery in the most egregious cases. And because TSA did not seek to enforce the broader position against Spirit, fair notice as to that interpretation is not at issue.

Spirit claims (at 41) that it previously handled fee refunds in the same way, but it offers no evidence that TSA looked for this issue in prior audits or, more importantly, indicated any approval of Spirit's practices.

Finally, Spirit has forfeited any fair-notice objection as to its cancellation-fee argument by offering (at 42) only a single sentence on the issue. *See United States v. Osmakac*, 868 F.3d 937, 956 (11th Cir. 2017) (holding issue waived where "appellate brief devotes only a single sentence to" issue).

3.      Spirit complains (at 43) that TSA's position is "unnatural," an argument that has little to do with fair notice and is incorrect in any event. Spirit objects (*id.*) that, under TSA's interpretation, whether a refund occurs depends "on what the customer does with it in the future." But it is Spirit's act in putting the fee back into its own pocket that reverses the refund, not the passenger's. *See* AR113 (Spirit declaration explaining that, upon expiration of the credit, Spirit engages in a "separate and distinct" transaction to recognize the credit as revenue). It is entirely

45

natural to differentiate between cases in which Spirit pockets the fee and provides nothing to the passenger in return and cases in which Spirit treats the fee as the equivalent of cash that has been refunded to the passenger.

Spirit's analogy (at 43-44) to cashing a check lacks merit.  It is not entirely clear that an airline is entitled to seek reimbursement from TSA if it is unable to effectuate a transfer of the fee from its own account to the passenger's.  But in any event, the mechanism for returning the fee plainly matters.  The force of the hypothetical comes from the fact that a check is a routine means of transferring unrestricted funds that requires simple procedural steps by the recipient to receive. If Spirit instead placed cash in a hard-to-reach location and authorized the customer to retrieve it, Spirit plainly would not have effectuated a refund.  The relevant distinction is that Spirit is not entitled to place barriers in the way of obtaining the refund and then use the passenger's failure to retrieve the funds as a means of padding its own bank account.  Spirit cannot accomplish the same result by placing the fee amount in a credit usable only in limited circumstances and then seizing the fee for itself if the passenger cannot use it within 60 days.

Spirit also objects (at 44-45) that if it remits the fee from a canceled ticket to TSA, TSA may obtain a fee for travel that never occurred.  But that result is also possible in every scheme discussed above in which collection agents provide refunds to customers and are reimbursed in turn by the government.  *See supra*

pp. 21-24. If the collection agent fails to comply with its refund responsibilities, the government may be left with fees or taxes that should have been refunded to the customer. None of the cited cases in which this occurred suggest that this result is unlawful on the government's part or that the collection agent should be permitted to pocket the fee instead. If, however, the collection agent correctly refunds its customers, then all overpaid fees will be returned to the proper parties. It is therefore Spirit's own actions, not the government's, that create the possibility that TSA will receive fees for travel that does not occur. As discussed, under the proper interpretation of the statute, Spirit has an incentive to avoid that result, thus ensuring that the fees are refunded. And Spirit does not explain why it makes sense for Spirit to retain a fee for travel that never occurred when Spirit is never allowed to retain fees in any circumstances.

Spirit cites (at 45-46) the fact that four other airlines, all represented by the same counsel as Spirit, are also contesting similar TSA audit findings. However, Spirit ignores the fact that most airlines, including many of the largest, are not. As TSA's decision explained, other "air carriers with similar policies regarding non-refundable air transportation do not" retain security fees for themselves in similar circumstances. AR200 n.14. Spirit's practices therefore give it an advantage over its competitors. Every year, passengers will cancel a predictable percentage of tickets, resulting in the issuance of expiring credits that include collected fee

47

amounts. A predictable percentage of those credits will then expire, allowing

Spirit to put the fees in its own pocket as revenue. Through this mechanism, Spirit

has created a profitable revenue stream based on its role as a collection agent for

the United States that is unavailable to airlines that follow the rules. Ultimately,

Spirit seeks to enrich itself with fees that it collected in the name of the United

States, at the expense of the passengers who actually paid the fees. That is the real

"unnatural" position in this case.

## CONCLUSION

For the foregoing reasons, the petition for review should be denied.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*
DANIEL TENNY

  s/ Weili J. Shaw
WEILI J. SHAW
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7240*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1371*

SEPTEMBER 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,865 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

s/ Weili J. Shaw
WEILI J. SHAW